FILED

10:17 am, 12/28/22

Tim J. Ellis
Clerk of Court

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| In re:<br><br>BILLY DEE PETERSON<br><br>Debtor<br><br>DAVID MILLER, Trustee of the Chapter 7<br>Bankruptcy Estate of Billy Dee Peterson<br><br>Plaintiff,<br><br>v.<br><br>BILLY DEE PETERSON; JULIE BARNES;<br>DIAMOND LAND TRUST; DIAMOND<br>LAND TRUST – 19; BILLY DEE PETERSON, as the<br>purported trustee of the Diamond Land Trust – 19; EARL<br>LAWRENCE; EARL LAWRENCE, as the purported<br>trustee of the Diamond Land Trust – 19; CITI TRUSTEE<br>SERVICES, LLC, as the purported trustee of the Diamond<br>Land Trust – 19; MOUNTAIN MEADOW LOG HOMES,<br>LLC; MW DESIGN AND CONSTRUCTION, LLC;<br>COWBOY STATE PROPERTIES, LLC; WILLOW<br>SPRINGS, LLC; and DOES 1-10,<br><br>Defendants. | Case No. 19-20027<br>Chapter 7<br><br><br><br><br><br><br>Adversary No.  20-02009 |

**MEMORANDUM OPINION**

At its core, this proceeding presents the intersection of state law and federal bankruptcy law, requiring the court to determine whether Montana real estate, allegedly held in a Montana land trust, and construction equipment are property of Debtor's bankruptcy estate under Section 541(a)(1) of the Bankruptcy Code[1] and therefore subject to turnover for the Chapter 7 trustee to administer. The issues entail examination of Montana trust law and Wyoming alter ego law to determine whether Debtor Billy Dee Peterson had an interest in the subject property on the date he filed bankruptcy. If so, it is estate property and the Trustee may recover the property or its value for distribution to unsecured creditors.[2] As with most cases like this one, the facts are complicated and

---

[1] All references to the Bankruptcy Code, Code, or to Sections thereof, are to 11 U.S.C. §§ 101 *et seq.*

[2] This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (E) and (O) over which the court has subject matter jurisdiction. 28 U.S.C. §§ 1334 and 157(b)(1). The parties consent to this court entering final judgment in this matter. ECF No. 119, at ¶ 1.

contested and require the court to evaluate the witnesses' credibility. Following four days of trial, the court issues this final order on the "estate property" claims asserted in this adversary proceeding.

I.   **Procedural History**

Debtor filed this Chapter 7 bankruptcy on January 23, 2019.  On August 30, 2019, the duly-appointed Chapter 7 trustee David Miller commenced an adversary proceeding against Debtor, his construction companies Mountain Meadow Log Homes, LLC (MMLH) and MW Design and Construction, LLC (MW Design), purported land trusts named Diamond Land Trust and Diamond Land Trust-19 (DLT-19) and several purported trustees thereof, and other parties. The Trustee's Complaint sought, in part, declaratory relief and recovery of a tract of real estate in Roberts, Montana with a home Debtor built thereon, certain items of construction equipment, and real estate in Etna, Wyoming as property of the bankruptcy estate; the balance of the claims asserted a general objection to Debtor's discharge on various grounds under Section 727.[3]

On or about March 28, 2020, the Trustee bifurcated the "estate property" claims from the Section 727 claims, filing the current adversary proceeding to first hear and decide the overarching issue of whether the Roberts and Etna properties and construction equipment are property of the bankruptcy estate subject to the Trustee's administration. As relevant to this opinion, the Trustee seeks a determination that: 1) MMLH and MW Design are Debtor's alter egos and have no separate legal existence; 2) the named trusts—Diamond Land Trust and/or DLT-19—are not legally created trusts and have no interest in the Roberts property, or alternatively, the trust(s) are Debtor's alter ego(s); and 3) on the Petition Date, Debtor had an interest in the Roberts property, the Etna property, and construction equipment making them property of his bankruptcy estate. To recover the property, the Trustee seeks: 1) imposition of a resulting trust or constructive trust in the Roberts and Etna properties in the Trustee's favor; 2) a determination Debtor is the sole owner of the Roberts property and quieting title in Debtor pursuant to state law; 3) entry of a judgment vesting title to the Roberts property in the Trustee pursuant to Fed. R. Bankr. P. 7070 incorporating Fed. R. Civ. P. 70; 4) avoidance of Debtor's transfer of his interest in the Roberts property as an actual or constructively fraudulent transfer under Section 544(b) and the Montana Uniform Fraudulent Transfer Act and preserving and recovering the avoided transfer for the estate's benefit under Sections 550 and 551; and/or 5) an unjust enrichment finding for Debtor's contributions to the Etna property.[4]

Following more than a year of discovery, Mr. Peterson, individually and as the purported director of DLT-19, and his construction entities MMLH and MW Design (collectively the Peterson

---

[3]  *Miller v. Peterson, et al.*, Adv. No. 19-2012 (Bankr. D. Wyo.) (dismissed September 28, 2022).
[4]  ECF No. 119.

Defendants), moved for summary judgment and/or to dismiss the Trustee's claims.[5] Defendant Julie Barnes, individually and as the purported trustee of DLT-19, and her entities Cowboy State Properties, LLC and Willow Springs, LLC (collectively the Barnes Defendants) joined, in part, in the summary judgment motion.[6] The court issued its Order on Summary Judgment denying the motions to dismiss and for summary judgment, concluding the Trustee pled sufficient plausible facts for each claim and there were material facts in dispute with respect to all claims.[7]

The case proceeded to trial on March 15, 2022. At the close of the Trustee's case-in-chief, the Peterson and Barnes Defendants moved to dismiss. The court treated the motion as one for judgment on partial findings under Fed. R. Civ. P. 52(c), made applicable to this proceeding by Fed. R. Bankr. P. 7052.[8] For the reasons stated on the record, the court granted and denied the motion in part. The court dismissed defendant Earl Lawrence, individually and as purported trustee of DLT-19. The court granted the Barnes Defendants judgment on all claims related to the Etna property, including the unjust enrichment claim. The court deferred ruling on the alter ego, construction equipment claims, the DLT-19 and Roberts property claims, and on the imposition of resulting or constructive trusts, and the Trustee's claims to quiet and vest title. To summarize, the following parties remained defendants at the close of trial: Peterson, individually and as purported trustee of DLT-19; Diamond Land Trust; DLT-19; MMLH; MW Design; Citi Trustee Services, LLC as purported trustee of DLT-19; and Julie Barnes, individually and as purported trustee of DLT-19.

## II.    **Findings of Fact**[9]

### A.    **The Parties**

1.    *Debtor Peterson and Peterson entities MMLH and MW Design*

On the Petition Date, Debtor lived in Etna, Wyoming. He is a long-time self-employed general building contractor who conducts his residential construction business as a sole proprietor or through limited liability companies, MMLH and MW Design, of which he is the sole member and

---

[5] ECF Nos. 47 and 48.

[6] ECF No. 49. Defendant Earl Lawrence and Citi Trustee Services, LLC moved for judgment on the pleadings on Barnes' crossclaims for lack of subject matter jurisdiction, or alternatively, to abstain. ECF Nos. 69 and 70. The court dismissed the Barnes crossclaims. ECF No. 75.

[7] ECF No. 77.

[8] In evaluating a Rule 52(c) motion, the nonmovant is not entitled to any special inference and the evidence is not considered in a light most favorable to the nonmovant. Rather, the trial court determines whether the nonmovant failed to make a prima facie case, *or* after weighing the evidence and assessing the credibility of the witnesses, determines that a preponderance of the evidence cuts against the plaintiff's claim. *In re Renewable Energy Dev. Corp.,* No. 2:12-CV-00771, 2014 WL 527229, at *4 (Bankr. D. Utah Feb. 10, 2014).

[9] The court's factual findings include those stipulated facts set forth in the final Pretrial Order, ECF No. 119, the undisputed material facts in the court's Summary Judgment Order treated as established under Fed. R. Bankr. P. 7056 and Fed. R. Civ. P. 56(g), and those findings of fact based on the evidence presented at trial.

owner. Debtor organized both entities under Wyoming law and has operated MMLH since 1995[10] and MW Design since 2016.[11]

On May 28, 2007, the state of Wyoming administratively dissolved MMLH and showed it as inactive on Wyoming's corporation records.[12] Debtor claimed MMLH was "idle" between 2016-2018 and generated no income during this period. Shortly before filing bankruptcy, Debtor "created another iteration of MMLH" on January 4, 2019, claiming he intended to resume building under this entity.[13] While MMLH was idle between 2016-2018, Debtor was apparently operating MW Design during this period, developing the Etna property with Ms. Barnes. MW Design maintained checking and savings accounts with First Interstate Bank.[14] Debtor and Ms. Barnes, for an unknown period, were signatories on the checking account. Debtor provided no evidence of personal banking accounts—only business accounts.

Prior to filing bankruptcy, Debtor contemplated forming a construction financing business called RM Funding, but it never came to fruition and there was no evidence RM Funding held any assets or funds or made any loans. As explained later, Debtor used this fictitious entity to create a fabricated lien against the Roberts property.

### 2.   *Heidi Christensen (a non-party)*

Ms. Christensen is not a party to this proceeding. She is Debtor's former girlfriend. They were engaged in the spring of 2010 and purchased a 14-acre tract of land in Roberts, Montana (Roberts Property) with $49,000 seller financing.[15] They each funded one-half of the $22,000 cash down payment. At Debtor's direction, the Roberts Property was titled solely in Christensen's name to protect the property from creditors.

In or around February 2013, after Christensen's and Debtor's relationship ended, they entered into a Contract for Deed Agreement (2013 Agreement) under which "Diamond Land Trust" would purchase Ms. Christensen's interest in the Roberts Property.[16] Debtor executed the 2013 Agreement as "Buyer Trustee," despite acknowledging no such trust existed.

Creating additional confusion, Ms. Christensen signed another agreement over a year later, on September 29, 2014 (2014 Agreement), to sell the Roberts Property to "Diamond Land Trust-19"

---

[10]  Ex. Y-BP at p. 1 (formed as a Wyoming limited liability company on February 1, 1995 with Debtor as the member/manager); at p. 2 (last annual report filed in 2005).

[11]  Exs. 44, 45 and 46.

[12]  Ex. Y-BP at p. 3.

[13]  Ex. Y-BP at pp. 4-5; Ex. I-BP (Articles of Organization filed January 4, 2019 showing Debtor as organizer, registered agent, and managing member of MMLH with an email address for MW Design); ECF No. 119, Uncontroverted Fact ¶ 4.j.

[14]  Exs. 48 and 49.

[15]  Exs. 5 and 6; ECF No. 119, ¶ 4.k.

[16]  Ex. 8.

(DLT-19) the day before she conveyed the property.[17] Debtor personally paid Ms. Christensen and on September 30, 2014, she conveyed the Roberts Property at Debtor's request to DLT-19.[18] Ms. Barnes signed the 2014 Agreement as Trustee of DLT-19, despite all parties acknowledging the first document attempting to create DLT-19 was the same day as the conveyance, a day after the 2014 Agreement.[19]

### 3. *Diamond Land Trust and DLT-19*

Per the 2013 Agreement, Debtor purportedly purchased Christensen's interest in the Roberts Property on behalf of "Diamond Land Trust" as "Buyer Trustee." However, no "Diamond Land Trust" existed in 2013, or ever existed. When asked at trial about the difference between Diamond Land Trust and DLT-19, Debtor conceded there never was a Diamond Land Trust.

DLT-19 is the purported land trust Debtor sought to create to hold title to the Roberts Property. Several different versions of the purported DLT-19 trust document were offered into evidence at trial: Exhibits 13, 21, 24[20], and Debtor's claimed version, Exhibit S-BP, a combination of Exhibits 13 and 24. The earliest version of the purported DLT-19 trust agreement is dated September 30, 2014 and consists of a single page, Exhibit 13. Debtor initially asserted Ms. Christensen's execution of the warranty deed he drafted, along with the one-page "Trust Agreement" dated September 30, 2014, created DLT–19. The one-page document identifies Julie Barnes as the Trustee of a trust that is not named anywhere in the document, who "is about to take legal and equitable title" to the Roberts Property.[21] Ms. Barnes signed the Trust Agreement as trustee but her signature was not notarized. The September 30, 2014 "Trust Agreement" does not identify any grantor, director, or beneficiary of the un-named trust, and leaves blank the successor in interest provision. Nor was this document ever filed in any public records. Debtor claims this "Trust Agreement" was subject to Montana law. Nothing in the Christensen deed connects the conveyance of the Roberts Property with the September 30, 2014 "Trust Agreement."

---

[17] Ex. 11.

[18] Exs. 10 and 12.

[19] Id.

[20] Debtor introduced Trial Exhibit 24, titled a Land Trust Agreement governed by Montana law (the Montana Trust), in his summary judgment motion as part of Exhibit 2. *See* ECF No. 47, at pp. 16-44. Though all counsel referred to Exhibit 24 numerous times during examination of witnesses at trial, it was never formally admitted into evidence. Counsel agreed to use Debtor's Exhibit S-BP, which was admitted into evidence and consists of two trust instruments—the Land Trust Agreement (Exhibit 24), the schedule of Trust Property, and the one-page Trust Agreement dated September 30, 2014 (Exhibit 13). The court has endeavored to cite to Exhibit S-BP when referencing the purported Montana Trust or its provisions.

[21] Ex. 13.

4.  *Julie Barnes*

Ms. Barnes is a licensed real estate agent, involved in the purchase and development of commercial and residential property in Wyoming. At the time of trial, Ms. Barnes lived in the Star Valley Ranch area of Wyoming at the Etna property. Ms. Barnes has known Debtor for many years as they lived in the same area of Wyoming. She reconnected with Debtor through an online dating site and they began dating in July 2013. At the time, Debtor was building homes in North Dakota through BP Construction, LLC, Debtor's jointly owned business with David Bishop. Ms. Barnes marketed some of the North Dakota homes as an independent contractor, but she has no ownership or membership interest in the BP business.

Debtor and Ms. Barnes were in a relationship for several years, and were engaged at some point, before their relationship ended. During part of that period, Barnes lived with Debtor at the Roberts Property. Barnes was closely involved in helping Debtor attempt to set up a trust to hold title to the Roberts Property. Under one attempt, Barnes was named as trustee of the purported DLT-19 trust, Exhibits 13 and S-BP (Montana Trust). Under another attempt, she was named the 100% beneficiary of the purported DLT-19 trust Mr. Lawrence drafted, Exhibit 21 (Virginia Trust).

Ms. Barnes testified DLT-19 was formed to take title to the Roberts Property. She prepared and signed the one-page Trust Agreement dated September 30, 2014, represented by Exhibit 13. Despite claiming at trial the Virginia Trust never "went into effect," Ms. Barnes acted as though it was in effect. Ms. Barnes testified in her deposition she believed herself to be the current DLT-19 beneficiary assuming the Virginia Trust was effective.[22] On August 20, 2018, Ms. Barnes terminated Debtor as director of DLT-19 by letter accepted by Citi Trustee Services, LLC as Trustee.[23] In her Answer to the Complaint, she admitted emailing Mr. Lawrence declaring:

> [Debtor] and I are very close to a Settlement Agreement. Once that is in place, I will then instruct you to deed the [Robert's Property] over to [Debtor] and will relinquish my position as beneficiary. The attorney in Red Lodge – Heidi – will prepare the deed and realty transfer certificate for your signature. . . . I will take no action until Billy has signed the Settlement Agreement.[24]

Ms. Barnes, along with Debtor, prepared the Montana Trust identified as Exhibit S-BP from materials and resources they claim came off the internet. Ms. Barnes was the DLT-19 trustee under the Montana Trust version but she was the beneficiary under the Virginia Trust version. She also executed the fictitious RM Funding promissory note and Trust Indenture as trustee of DLT-19 but did not know the purpose of the purported $295,000 loan that was never made.[25]

---

[22] ECF No. 61. Brief Barnes Reply to MSJ. Ex. A, p. 42.
[23] Ex. 37.
[24] ECF No. 28, ¶ 93. The email itself was not admitted into evidence.
[25] Exs. 14 and 15.

Ms. Barnes held developed properties in her single member LLCs, Cowboy State Properties and Willow Springs. Ms. Barnes and Debtor did not share ownership of their respective LLC entities, but the LLCs shared commonalities including email addresses. They both had separate bank accounts and one joint account. Ms. Barnes was on Debtor's MW Design account for an unspecified period. At MW Design's inception in January of 2016, Barnes was appointed as a manager, along with Debtor, of MW Design.[26] She was also appointed registered agent of MW Design in 2017 and she resigned that appointment in 2018, apparently when her relationship with Debtor ended.[27]

5. *Earl Lawrence and Citi Trustee Services, LLC*

Mr. Lawrence is retired and lives in Virginia. He is the sole owner and member/manager of Citi Trustee Services, LLC, through which he provides trust services and assistance with trust documents for investors. He is not a licensed lawyer but has "set up" about 200 "land trusts" in the past ten years, with his company Citi named as the trustee of those land trusts. Per the application, Ms. Barnes initially contacted Mr. Lawrence in October 2014 regarding setting up a land trust.[28] Mr. Lawrence prepared the DLT-19 Virginia Trust version represented by Exhibit 21, under which Citi was the trustee of DLT-19. According to Mr. Lawrence, he was asked to amend the one-page September 30, 2014 "Trust Agreement", Exhibit 13. He asserts he was not provided with Exhibit S-BP by Ms. Barnes or Debtor, in preparing the Virginia Trust.

6. *Patricia McDonald*

Ms. McDonald became acquainted with Debtor in September 2007, and they dated off and on until 2011. While they were dating, she visited the Roberts Property. Debtor told Ms. McDonald he bought it and put it in a trust in his children's names to protect it from creditors. He never mentioned DLT-19's specifics to her.

Debtor asked Ms. McDonald to invest in various real estate ventures, but they were not involved in business deals together. She bought one property in southern Utah that Debtor renovated and sold. She declined to buy one of Debtor's properties in Wyoming that was in foreclosure and to finance construction of a home Debtor was building for his nephew. Ms. McDonald knew Debtor was in financial trouble and involved in lawsuits during 2008-2011.

In September 2011, Debtor approached McDonald to borrow $25,000 for an alleged revolving bank loan Debtor represented the existing creditor was not going to renew; she agreed to

---

[26] Ex. 44, at p. 3.
[27] Exs. 45 and 46.
[28] Ex. 16. Ms. Barnes says the date is wrong, and does not know where it came from, though she filled out all the information on the data sheet. She contended at trial that she contacted Lawrence in October 2015. However, in her affidavit, Ex. SS-JB, she contends she contacted Mr. Lawrence in early October 2014.

loan him $10,000.[29] Debtor was to repay the loan in one year and secured the loan with a JCB forklift Debtor said was his and provided her the serial number. Debtor did not repay any portion of the loan over the next eight years. In January 2019, Debtor told Ms. McDonald he was getting ready to file bankruptcy and paid her $2,000 in cash on the loan. At that time, Debtor represented to Ms. McDonald he still had the forklift. At trial, Debtor testified he sold that forklift in January 2019.

After Debtor filed bankruptcy, Ms. McDonald testified he proposed to transfer construction equipment (another forklift, a truck, and two trailers) to her that the Trustee was pursuing and lease it back from her. Ms. McDonald rejected this proposal.

### 7. *David Bishop and BP Construction, LLC*

Mr. Bishop lives in Wyoming and met Debtor sometime in 2009 through Patricia McDonald. Debtor repaired broken pipes in Mr. Bishop's home and built an addition thereto. In the spring of 2011, Mr. Bishop loaned Debtor $18,000 to help construct the home on the Roberts Property. Later, in early 2012, Mr. Bishop's single-member LLC (Bishop Property Management, LLC) and Debtor went into business together, forming BP Construction, LLC (BP) to build spec homes in North Dakota. Mr. Bishop was the managing member and Debtor was a member.[30] Mr. Bishop's LLC was to provide construction financing and Debtor's role was to manage the construction and conduct the daily construction activities. Debtor, individually, was responsible for providing equipment used in construction, including tools.[31] As construction manager, Debtor was to be paid $4,000 per month. Mr. Bishop, through Bishop Property Management, LLC, initially funded the business checking account. Approximately five homes were eventually built and sold under this arrangement. Debtor's entity, MMLH, leased construction equipment to BP, but Bishop was unaware of the equipment leases until March of 2022.[32]

By the fall of 2014, the business relationship between Mr. Bishop and Debtor had soured when construction costs on the spec homes allegedly went unpaid and some of the homes were not completed. At that time, Debtor had yet to repay the $18,000 loan and Mr. Bishop had his lawyer draw up a Trust Indenture and Collateral Assignment to secure the loan, under which Debtor, individually and on behalf of the "Diamond Land Trust," conveyed in trust his interest in the Roberts Property to Mr. Bishop.[33] Debtor did not repay the $18,000 loan, and Mr. Bishop filed a proof of claim for this loan in Debtor's bankruptcy case.[34]

---

[29] Ex. 7.
[30] Ex. 41
[31] Exs. 41; K-BP.
[32] Exs. L-BP and M-BP.
[33] Ex. 9 (The Trust Indenture, effective March 25, 2013, was filed of record in Montana with the county clerk on August 7, 2014).
[34] Proof of Claim 10-1.

On December 17, 2015, Mr. Bishop and his management company sued Debtor for damages in Wyoming state court, alleging breach of contract, fraud, and other claims. During this ongoing dispute over the BP construction venture, the Virginia Trust version of the DLT-19 trust agreement was finalized. Debtor's bankruptcy stayed the scheduled trial of that ongoing litigation. Mr. Bishop filed a second proof of claim in excess of $500,000 related to this litigation.[35]

       8. *Rebecca Wait*

Ms. Wait is Debtor's adult daughter and lives in Washington state. She was named the sole beneficiary under the purported Montana Trust version of DLT-19,[36] and was named a successor beneficiary in the purported Virginia Trust version of DLT-19. Ms. Wait was initially named a party defendant in the Trustee's adversary proceeding (Adv. No. 19-2012), but pursuant to a *Joint Stipulation and Notice of Dismissal with Prejudice and Waiver of Interest in Property* filed October 10, 2019, the Trustee dismissed Ms. Wait from the proceeding upon her stipulating "she had no knowledge of or part in the creation of the purported trust that named her as the sole beneficiary" of the Roberts Property and "waives any interest" in it.[37] Ms. Wait did not testify at trial. Even without the stipulation and Ms. Wait's testimony, there was no evidence from the myriad of documents relating to DLT-19 suggesting Ms. Wait ever exercised any powers over the Roberts Property or the trustee under any version of the DLT-19 trust between 2014 and 2019.

## B. **The Roberts Property**

In 2010, Debtor, with his then-girlfriend, Heidi Christensen, purchased the Roberts Property, each contributing $11,000 in cash for the down payment to purchase the land and financing the balance through the seller.[38] At Debtor's direction, they placed title to the Roberts Property solely in Ms. Christensen's name.[39] Debtor claimed that was because Ms. Christensen had "better credit." Ms. Christensen testified it was to protect the property from creditors. Debtor thereafter commenced constructing a home on the Roberts Property.

In or around February 2013, after Ms. Christensen's and Debtor's relationship ended, they entered into the 2013 Agreement by which the admittedly non-existent "Diamond Land Trust" would purchase the Roberts Property from Christensen, agreeing to pay $1,500 per month until the "mortgage" was paid in full.[40] The agreement also gave the buyer immediate possession of the

---

[35] Proof of Claim 11-1 and Part 5 (Complaint).

[36] Any reference in this decision to "the Trust" or similar is not to be considered any finding as to the validity or existence of a trust as further explained in the decision memorandum.

[37] *See* ECF No. 14.

[38] Ex. 5.

[39] Ex. 6 (warranty deed conveying Roberts Property from seller to Christensen); ECF No. 119, ¶ 4.k.

[40] Ex. 8 (Contract for Deed dated February 18, 2013 with Ms. Christensen as seller and Diamond Land Trust as buyer); ECF No. 119 ¶ 4.l.

Roberts Property and required the buyer to maintain it. Only Debtor made the payments called for by the 2013 Agreement; Debtor personally purchased the Roberts Property from Ms. Christensen, despite having prepared and signed the Agreement as "Buyer Trustee" for the "Diamond Land Trust." No such trust ever existed, and Debtor was never a named trustee of any trust.

The subsequent 2014 Agreement entered into on September 29, 2014 between Ms. Christensen and DLT-19 was signed by Ms. Barnes as trustee, although no document existed at that point to identify Ms. Barnes as a trustee of DLT-19.[41] According to the 2014 Agreement, the buyer was supposed to pay $8,500 by continuing to make: "monthly payments of $954.00 to Joseph Ricci totalling [sic] approximately $7,500 until paid in full. . . ." However, Ms. Christensen conveyed the Roberts Property at Debtor's request, by warranty deed (supplied by Debtor) the next day, September 30, 2014, to DLT-19.[42] The conveyance was made to DLT-19 directly, not to a named DLT-19 trustee. The deed was recorded on December 19, 2014, the same date Debtor and Ms. Barnes falsified the RM Funding transaction described below.

At the time of the 2013 Agreement and at all relevant times thereafter, Debtor had not repaid any amount on the Bishop loan, nor on the McDonald loan. Mr. Bishop insisted Debtor execute a trust indenture and collateral assignment on the Roberts Property to secure the loan. Debtor did so, signing the agreement both individually and as "Trustee" to the nonexistent entity, "Diamond Land Trust."[43] Debtor later scratched "Trustee" out, since he recognized there was no such trust. Debtor executed the Indenture in favor of Mr. Bishop despite the Roberts Property still being titled in Ms. Christensen's name, who did not owe any money to Mr. Bishop, and despite his knowledge Diamond Land Trust did not exist. The Trust Indenture was recorded on August 7, 2014.[44]

Less than a month later, Debtor and Ms. Barnes filed a false lien against the Roberts Property using the fictitious, non-existent business RM Funding. Debtor and Ms. Barnes prepared a $295,000 fictitious promissory note dated October 6, 2014, payable to RM Funding; RM Funding did not fund such a loan and DLT-19 did not receive $295,000.[45] On December 19, 2014, Ms. Barnes signed the note as the purported trustee of DLT-19. The note was secured by a Trust Indenture dated October 6, 2014, also signed by Ms. Barnes as purported trustee of DLT-19.[46] Both the note and trust indenture were filed in the Montana property records against the Roberts Property on December 19, 2014, the same date the Christensen deed to DLT-19 was filed of record.

---

[41] Ex. 11.
[42] Ex. 10; Ex. 12.
[43] Ex. 9.
[44] Id.
[45] Ex. 14.
[46] Ex. 15.

When attempting to gain additional construction financing for the Roberts Property, Debtor represented to the title company RM Funding was a sole proprietorship of which he was the 100% owner.[47] However, Debtor admitted the idea for RM Funding never came to fruition. Following difficulty getting financing on the Roberts Property, Debtor executed a "full reconveyance" and release on behalf of RM Funding, stating the note had been fully paid and satisfied and requesting cancellation of the note and trust indenture.[48] That, of course, was untrue, as there was no entity known as RM Funding and RM Funding never made a loan. Debtor admitted as much at trial, and never provided a legitimate explanation of the purpose of the RM Funding transaction.

For her part, Julie Barnes testified RM Funding was a business Debtor owned. She admitted to assisting Debtor in preparing the promissory note and trust indenture, and she signed those documents as trustee of DLT-19, at Debtor's request. However, Ms. Barnes claimed no knowledge of the documents' purpose and admitted RM Funding did not actually loan any money to anyone.

C. **Debtor's Efforts to Obtain Financing, Create the DLT-19 Trusts, and Sell the Property.**

1. *Debtor's attempt to finance the Roberts Property*

After Debtor's source of financing from individuals to complete the home improvements on the Roberts Property apparently dried up, the purported DLT-19 trust, through Debtor and Barnes, then turned to conventional borrowing. They encountered difficulty procuring a loan, and ultimately failed to secure a loan on behalf of DLT-19 because title insurance could not be obtained on the Roberts Property. Debtor initially presented the title company with only the one-page, unnamed "Trust Agreement" dated September 30, 2014. In a November 2, 2015 e-mail from Ms. Kroll at the title company, she states "Here is the Trust Agreement that Billy brought into my office today. It does not state the name of the Trust it affects nor the duties of the Trustee."[49] This statement is consistent with Exhibit 13 but not Exhibit S-BP. This created concerns because the title company lacked information regarding the trust's name, and the trustee's duties and authority under the trust.[50] In response, Debtor agreed, as purported director, to amend the trust agreement—an action he had no authority to do under any of the versions of trust agreement.[51] Debtor agreed to provide additional trust documentation, which never happened. Instead, he informed the title company he would hire a professional trustee service and would provide a "new/amended Trust Agreement."[52]

---

[47] Ex. 20, at pp. 2-3.

[48] Ex. 18.

[49] Ex. 20, at p. 3.

[50] *Id.* at p. 2.

[51] *Id.* at p. 3.

[52] *Id.* at p. 1. Debtor and Ms. Barnes had been in contact with Earl Lawrence of Citi Trustee Services, LLC in late October-early November before authorizing him to proceed with the amended "Diamond Land Trust" on November 3, 2015. *See* Ex. 19 e-mail thread.

Ms. Barnes testified her and Debtor's attempts to obtain a DLT-19 construction loan to finish constructing the home were ultimately unsuccessful due to an inability to provide clear title, obtain title insurance, or otherwise resolve the issues noted by the title insurers. A November 18, 2015 title insurance commitment issued by Old Republic National Title Insurance Company never became effective because the identity of the "Proposed Insured" was never listed in Schedule A.[53] It further imposed certain requirements under Schedule B with respect to the "Diamon [*sic*] Land Trust-19," including "the power of the trustee to act in the pending transaction and capabale [*sic*] of holding title", together with any other information that may be required.[54] The Commitment itemized policy exceptions for the Trust Indenture and Collateral Assignment securing Bishop's $18,000 loan and the RM Funding Note and Trust Indenture by DLT-19, notwithstanding the previously recorded release and full reconveyance.[55]

When it appeared they would be unable to obtain financing given the title issues and failed attempts at a legitimate trust structure, Debtor and Ms. Barnes asked Mr. Lawrence, as manager of Citi, the trustee of DLT-19 under the purported Virginia Trust, to execute and return a warranty deed to transfer the Roberts Property out of trust and place it in Ms. Barnes' individual name until they obtained financing.[56] Mr. Lawrence indicated he could not do so unless they first recorded a deed conveying the Roberts Property to Citi as trustee of DLT-19, as such had never been completed and therefore Citi did not have legal title to the Roberts Property. Despite being informed of the need to transfer the Roberts Property to Citi as trustee, that never occurred and the trust problems continued to hamper Debtor's and Ms. Barnes' ability to convey clear title to the Roberts Property.

2.  *Attempted creation of new trusts*

Because title insurance could not be obtained, Ms. Barnes completed and provided an application to Mr. Lawrence, the managing member of Citi, to create the Virginia Trust version of DLT-19 to hold title to the Roberts Property in trust.[57] According to this application, the trust's creation date is October 6, 2014. Much debate occurred about this date; Ms. Barnes asserts the correct date was October 2015,[58] while the Trustee counters the date ties to the date of the false RM Funding promissory note, Exhibit 14. In any event, the application identifies Ms. Barnes as the

---

[53] Ex. 22, at pp. 1, 3.  Schedule A of the commitment provided that the proposed insured was "to be determined and agreed to by the Company." *Id.* at p. 3.

[54] *Id.* at p. 4 (requirement f).

[55] *Id.* at p. 6 (exceptions 17, 18, and 19).

[56] Ex. 23.

[57] Ex. 16 (the land trust data sheet completed by Ms. Barnes).

[58] The court notes that in an email exchange between Mr. Lawrence and Debtor on November 4, 2015, Debtor refers to a "revised" data sheet that he attached to the e-mail. *See* Ex. 19, at p. 2. The only property trust data sheet admitted into evidence was Ex. 16.

Virginia Trust grantor/creator, although she held no title to the Roberts Property in her name, and it identifies Citi as the trustee. Ms. Barnes is the primary beneficiary and Rebecca Wait the successor beneficiary. The application identifies Debtor as the director.

Using information from Ms. Barnes' application, Mr. Lawrence drafted a November 4, 2015 agreement titled "Amendment to Trust Agreement Dated September 30, 2014", naming the trust "Diamond Land Trust 19," and Ms. Barnes executed it on November 11, 2015 as the creator/grantor and 100 percent beneficiary.[59] Citi, with Mr. Lawrence as manager thereof, is named the trustee of the purported Virginia Trust. The document also recites Ms. Barnes is presently the trustee of the "Diamond Land Trust" under the Trust Agreement dated September 30, 2014 (Exhibit 13).[60] However, as Debtor conceded, there never was a Diamond Land Trust created, and the trust is not even named in the September 30, 2014 document. The purported Virginia Trust also erroneously recites Ms. Barnes is the 100% beneficiary of DLT-19. Recall the initial Trust Agreement did not name any beneficiaries. As discussed later, the Roberts Property was never deeded to Ms. Barnes individually in any form, so she could not have been the creator/grantor of the Virginia Trust.[61] Under Articles 1.5 and 1.6, Virginia law governs the purported Virginia Trust and is intended solely to be an "Illinois type Land Trust."[62] It is revocable.[63]

Debtor is listed as the director of the purported Virginia Trust. Ms. Barnes' written appointment of Debtor as director contains more inaccuracies.[64] Like the beneficiary recitals at the beginning of the Virginia Trust, Ms. Barnes erroneously represents in the director appointment appended to the Agreement she is the 100% beneficiary "to that certain Declaration of Trust and Land Trust agreement, dated on the 20th day of September, 2014, and which is known as Diamond Land Trust."[65] There was no "Declaration of Trust and Land Trust agreement" dated September 20, 2014 admitted into evidence, and in the September 30, 2014 "Trust Agreement," no beneficiaries were named and no trust was named; "Diamond Land Trust" was never created. Debtor's purported acceptance of the director position "as of September 20, 2014" references the same September 20, 2014 Declaration, not the Trust Agreement dated September 30, 2014 that the Virginia Trust purportedly amended.[66]

---

[59] Ex. 21 (the Virginia Trust).
[60] *Id.* at p. 1.
[61] Even if such action was done as trustee, no version of any trust document allowed the trustee authority to unilaterally transfer property.
[62] Ex. 21 at ¶¶ 1.5 and 1.6.
[63] *Id.* at ¶ 1.2.
[64] *Id.* at ¶ 6.4(d)-1 and p. 19.
[65] Exhibit 21, p. 19.
[66] *Id.* at p. 20.

An Exhibit A – Schedule of Trust Property attached to the Virginia Trust document provides the Roberts Property's legal description.[67] However, Ms. Barnes signed this Exhibit A as "Accepted by Trustee" on November 11, 2015, although she was no longer the trustee of DLT-19 per the new purported Virginia Trust; Citi replaced Ms. Barnes as trustee. Citi accepted its service as trustee of DLT-19 under the purported Virginia Trust but was never provided title to the Roberts Property.[68] There was no evidence of a conveyance of the Roberts Property to Citi or Mr. Lawrence to effect transfer of legal title of the Roberts Property to the trustee of the purported Virginia Trust.

Although Debtor and Ms. Barnes claimed at trial the Virginia Trust never "went into effect," their actions belie that claim. In her discovery responses, Ms. Barnes states she "believes that she is the beneficiary of the Diamond Land Trust – 19 pursuant to the Amendment to Trust Agreement created in Virginia."[69] Debtor and Ms. Barnes attempted to create and use the Virginia Trust to convince the title company to insure title to the Roberts Property for a DLT-19 loan request. By an e-mail dated November 20, 2015 and operating under an assumption Citi was the current trustee, Debtor and Ms. Barnes contacted Mr. Lawrence explaining: "We are having difficulty getting the home equity loan done, with the property being in a Trust."[70]

When the November 20, 2015 request of Citi to convey the Roberts Property to Ms. Barnes individually proved unsuccessful, Debtor and Ms. Barnes came up with a third version of a trust document for DLT-19, this one titled "Land Trust Agreement" made by "Diamond Land Trust 19" and "Julie Barnes as [t]rustee" (Montana Trust) (Exhibit S-BP).[71] This third iteration of trust agreement states it is governed by Montana law and is intended to be a "title holding or land trust."[72] It is revocable.[73] Ms. Barnes testified she and Debtor drafted this trust document using land trust information and resources off the internet. As Mr. Lawrence noted, many of the provisions in the purported Montana Trust document are suspiciously similar to his Virginia Trust version.

The Montana Trust document lists Rebecca Wait as beneficiary with a 100-percent interest and Sarah Styles as successor beneficiary. The power of direction rests with the beneficiary, who has authority to appoint a director. Debtor is named as director, but the document contains no written beneficiary appointment nor acceptance by Debtor, such as those in the purported Virginia Trust.[74]

---

[67] *Id.* at p. 21.
[68] *Id.* at p. 17.
[69] Ex. RR-JB, p. 8.
[70] Ex. 23.
[71] Ex. S-BP, pp. 1-28 only were admitted at trial.
[72] *Id.* at ¶¶ 1.4 and 9.5.
[73] *Id.* at ¶ 1.1.
[74] *Cf.* Ex. S-BP at ¶ 3.1 with Ex. 21, ¶¶ 6.4(a) and (d) and pp. 19-20.

Ms. Barnes contends she executed the Montana Trust document as trustee on September 30, 2014. Her signature appears on a separate page from the body of the trust provisions. According to Ms. Barnes, because she did not acknowledge her original execution of the September 30, 2014 "Trust Agreement" before a notary, she "re-signed" the Montana Trust in the presence of a notary on November 24, 2015 to provide the title insurance company proof of the signature's validity. The notary certifies on November 24, 2015, Ms. Barnes appeared before her and proved to the notary by satisfactory evidence to be the person whose signature appears on the document.[75] No notary witnessed, attested, nor verified on oath or affirmation Ms. Barnes appeared before such official and executed the Montana Trust on September 30, 2014, however.[76] At trial, Debtor and Ms. Barnes contended Exhibit S-BP is the governing trust instrument for DLT-19. As previously explained, that exhibit is a combination of Exhibit 13-the one-page September 30, 2014 Trust Agreement and Exhibit 2 to Debtor's Motion For Summary Judgment (the Montana Trust Agreement).[77]

### 3. *Debtor's attempts to sell the Roberts Property*

Three years later, in the spring of 2018, Debtor's attempts to sell the Roberts Property also proved unsuccessful. A March 28, 2018 title commitment, also issued by Old Republic, for a sale of the Roberts Property to Stephen and Julie Timmons (the proposed insured), contained similar requirements and exceptions as the commitment for the failed DLT-19 loan, and further required a quiet title action or an action to reform DLT-19 in order to insure a warranty deed to the proposed insured.[78] Two weeks later, an April 18, 2018 title insurance commitment issued for a sale to Shawmarie Hanson was virtually the same as the Timmons title insurance commitment.[79] Neither sale occurred because the title insurance company refused to insure title to the Roberts Property and the prospective purchasers were unable to get clear title. Debtor and Ms. Barnes again reached out to Mr. Lawrence, as manager of Citi, the named trustee under the purported Virginia Trust, to assist.[80] Mr. Lawrence again reminded them of the need for an executed deed.[81] For reasons unknown, Debtor and Ms. Barnes were unable or unwilling to satisfy the title insurer's requirements or Mr. Lawrence's request.

---

[75] Ex. S-BP, p. 27.

[76] *See* Mont. Code Ann. §§ 1-5-602(1) (defining "acknowledgment" as an individual's declaration before a notarial officer that the individual has willingly signed a record for the purposes stated therein and signed the record as the act of the individual identified in the record) and (13) (defining "notarial acts"); 1-5-603(1) (requirements for taking an acknowledgment); 1-5-610(1) and (2) (short form notary's certificate of acknowledgment in individual or representative capacity); and 1-5-610(3) (short form notary's certificate of verification on oath or affirmation); and 1-5-610(4) (short form certificate of witnessing a signature).

[77] *See* note 18, supra.

[78] Ex. 28, at p. 5 (requirements f, g, and i), and p. 7 (exception no. 19).

[79] Ex. 30 at p. 6 (requirements f, g, and i).

[80] Ex. 29, pp. 1-2.

[81] *Id.* at p. 1.

After the failed sales, Ms. Barnes and Debtor turned to leasing the Roberts Property.[82]  In July 2018, Debtor reached out to Mr. Lawrence, requesting he grant Debtor a limited power of attorney authorizing him as director under DLT-19 to lease the Roberts Property to Amy Hathaway. Mr. Lawrence, on behalf of Citi as trustee, did not grant or execute Debtor's requested power of attorney; he had no authority to do so. Yet Debtor, without the requested authority, and as purported director of the Virginia Trust, leased the Roberts Property to Ms. Hathaway with a three-month lease agreement dated July 14, 2018, with an option to purchase.[83] Tellingly, paragraph 18 of the lease provides upon its execution, the "Landlord intends to transfer ownership of the Premises to Billy Peterson."[84] During the lease, Ms. Hathaway was to remit $1,200 monthly rent payments to Debtor.[85] Debtor admitted he collected and endorsed the rent checks to his LLC and used the proceeds to continue improving the Property. Simultaneously with the lease agreement, Debtor, individually, as intended seller, and Ms. Hathaway, as intended buyer, entered into a "Purchase Price Agreement" on the Roberts Property for $249,900.[86] No sale to Ms. Hathaway occurred.

Ms. Barnes apparently discovered Debtor's dealings with Ms. Hathaway and communicated to Mr. Lawrence in August of 2018 her relationship with Debtor was coming to an end.[87] She asked Mr. Lawrence not to include Debtor on their future email correspondence and inquired whether he had signed the power of attorney, requesting that he not do so. In those email communications, Mr. Lawrence confirmed he had not signed the power of attorney and Ms. Barnes was the 100% beneficiary under the Virginia Trust. On August 20, 2018, Ms. Barnes, acting as the Virginia Trust beneficiary, terminated Debtor as director of DLT-19; Mr. Lawrence, as manager of trustee Citi, accepted and acknowledged Debtor's removal as director.[88]

### D. **Summary**

The court includes the following timeline to summarize the transactions at issue involving the Roberts Property, with supporting and corresponding exhibits where applicable:

| | | |
|---|---|---|
| Apr 20, 2010 | Debtor and Heidi Christensen purchase the Roberts Property and begin construction, each paying $11,000 for down payment, with Christensen financing balance of $49,000 through seller Ricci. | Ex. 5 |

---

[82] Ms. Barnes testified that prior to the attempted sales in 2018, DLT-19 leased the Roberts Property to Zac Johnston. She collected the lease payments from Johnston but did not know what she did with them.
[83] Ex. 34.
[84] *Id.*
[85] *Id.* at ¶ 3.
[86] Ex. 35.
[87] Ex. 36.
[88] Ex. 37.

| Apr 23, 2010 | The Roberts Property is conveyed by warranty deed to Christensen only, at Debtor's direction. | Ex. 6 |
|---|---|---|
| Apr 29, 2010 | The purchase deed in Ms. Christensen's name recorded. | Ex. 6 |
| Mar-Apr 2011 | David Bishop loans Debtor $18,000 to construct on the Roberts Property. | |
| Sept 16, 2011 | Patricia McDonald loans Debtor $10,000, secured by a JCB Forklift. | Ex. 7 |
| unknown but "effective Mar 25, 2013" | Debtor executes the Trust Indenture and Collateral Assignment of Purchaser's Interest, individually and as trustee of "Diamond Land Trust" to secure the Bishop loan. | Ex. 9 |
| Apr 8, 2013 | Debtor executes the 2013 Agreement (Contract for Deed dated Feb. 18, 2013) as "Buyer Trustee" of "Diamond Land Trust" to purchase Ms. Christensen's interest in Roberts Property. | Ex. 8 |
| Aug 7, 2014 | Bishop Trust Indenture encumbering the Roberts Property is recorded. | Ex. 9 |
| Sept 29, 2014 | Ms. Christensen enters into the 2014 Agreement (real estate sales contract to sell the Roberts Property to DLT-19 for $8,500 and assumption of financing); Julie Barnes signs as trustee of DLT-19; Debtor witnesses Christensen's signature. | Ex. 11 |
| Sept 30, 2014 | Debtor personally finishes paying $27,000 to Ms. Christensen for her interest in the Roberts Property. | Ex. 10 |
| Sept 30, 2014 | Ms. Christensen conveys the Roberts Property by warranty deed to DLT-19, at Debtor's direction. | Ex. 12 |
| Sept 30, 2014 | Ms. Barnes, as trustee, signs the "Trust Agreement" dated September 30, 2014, stating she is "about to take title" to the Roberts Property. The trust is unnamed and contains no identity of grantor, beneficiary or director. | Ex. 13 |
| Oct 6, 2014 | Ms. Barnes completes an application (trust data sheet) to create a Virginia Trust called "Diamond Land Trust – 19." The application identifies Ms. Barnes as the grantor/creator of the Trust, Debtor as director, Ms. Barnes as primary beneficiary, and Citi as the trustee. Ms. Barnes says the creation date should be 2015. | Ex. 16 |
| Oct 13, 2014 | Ms. Barnes, as trustee of DLT-19, executes a Trust Indenture dated Oct. 6, 2014 on the Roberts Property in favor of RM Funding to secure a $295,000 promissory note of the same date. | Ex. 15 |
| Dec 19, 2014 | Ms. Barnes, as trustee of DLT-19, executes a $295,000 promissory note dated Oct. 6, 2014 in favor of RM Funding. | Ex. 14 |
| Dec 19, 2014 | RM Funding promissory note and Trust Indenture are filed of record in the county records, although Debtor and Ms. Barnes admit the RM Funding loan never occurred. | Ex. 14, 15 |

| Dec 19, 2014 | The Christensen warranty deed to DLT-19 is recorded. | Ex. 12 |
|---|---|---|
| Aug 31, 2015 | Debtor, on behalf of RM Funding, executes and files of record, a full reconveyance and release of the RM Funding note, stating the note was fully paid and satisfied and requesting cancellation of the note and trust indenture. | Ex. 18 |
| Nov 11, 2015 | DLT-19 (Virginia Trust) document dated Nov. 4, 2015 (Amendment to Trust Agreement dated Sept. 30, 2014) executed by Ms. Barnes as purported grantor/creator and naming Citi as trustee, Debtor as director, Ms. Barnes as sole beneficiary, and Rebecca Wait as successor beneficiary. | Ex. 21 |
| Nov 18, 2015 | Title Insurance Commitment for the Roberts Property with undetermined "proposed insured", requirements and exceptions, in connection with unsuccessful DLT-19 loan. | Ex. 22 |
| Nov 20, 2015 | Debtor and Ms. Barnes request Citi to transfer the Roberts Property out of trust to Ms. Barnes individually to assist them to clear title and obtain financing. Citi informs them it cannot do so because they never transferred the Roberts Property to Citi as Trustee of the Virginia Trust. | Ex. 23 |
| Nov 23, 2015 | Debtor and Ms. Barnes reach out to Randy Hughes asking for two land trust forms. Mr. Hughes responds with attached documents. | CTS Ex. E |
| Nov 24, 2015 | Ms. Barnes executes a new Trust Agreement named DLT-19 (Montana Trust) designating herself as purported trustee, Debtor the director, and Rebecca Wait the beneficiary. Ms. Barnes claims she executed the Montana Trust on Sept. 30, 2014, but her signature was not notarized. On Nov. 24, 2015, a notary acknowledged Ms. Barnes' signature on the Montana Trust. Neither Ms. Wait nor Debtor executed the Trust Agreement. | Ex. 24 or Ex. S-BP, at pp. 1-27 |
| Dec 17, 2015 | Mr. Bishop sues Debtor in Wyoming state court over BP Construction, LLC contract. | POC 11-1 |
| July 15, 2017 | DLT-19 one-year lease of Roberts Property to Zac Johnston by Ms. Barnes as purported trustee (the lease is unsigned but Ms. Barnes testified the Roberts Property was in fact leased to Johnston). | Ex. H-JB |
| Mar 28, 2018 | Title Insurance Commitment issued for attempted sale of the Roberts Property by DLT-19 to Stephen and Julie Timmons. | Ex. 28 |
| Apr 18, 2018 | Title Insurance Commitment issued for attempted sale of the Roberts Property by DLT-19 to Shawmarie Hanson. | Ex. 30 |

| July 2018 | Debtor, as purported director of DLT-19, requests trustee Citi to grant him a power of attorney to lease the Roberts Property to Amy Hathaway; Citi declines to grant. | Ex. 36 |
|---|---|---|
| July 14, 2018 | Debtor, as purported director of DLT-19, executes a lease of the Roberts Property to Ms. Hathaway (with an option to purchase), which identifies Citi as the trustee; Debtor collects and uses the rent for his own purposes. | Ex. 34 |
| July 14, 2018 | Debtor, individually, executes a Purchase Price Agreement with Amy Hathaway regarding the Roberts Property. | Ex. 35 |
| Aug 20, 2018 | Ms. Barnes, as sole beneficiary of DLT-19 Virginia Trust, terminates Debtor as director; trustee Citi accepts Debtor's removal as director. | Ex. 37 |
| Jan 23, 2019 | Petition Date (Debtor files Chapter 7 Bankruptcy). | 19-20027, Doc No. 1 |

## E. Construction Equipment

The evidence regarding the construction equipment and its ownership is sparse. Debtor testified he used the following construction equipment in his business: a 9-ton boom truck (purchased in the 1990's), a skid steer/Bobcat (purchased new in 1995), and a forklift (purchased in the late 1990's or early 2000's). As developed at trial, there were apparently two JCB "forklifts," one of which was specifically identified and used to secure Ms. McDonald's 2011 loan to Debtor.[89] Though unclear, the other JCB forklift may refer to a Loadall used in the BP Construction venture in early 2012.[90] Debtor acknowledged he sold a forklift for cash in January 2019; it is unclear if this is the forklift securing the McDonald loan, and he did not explain what he did with the money. It is unclear whether this sale occurred before or after the Petition Date. In addition, Exhibit 50 shows two vehicle registrations issued in the name of MMLH: a 2018 registration on a 1997 WW flatbed trailer purchased in 2015, and a 2017 registration on a Ford 1985 Truck purchased in 2012. Given its weight of 22,000 pounds, the Ford appears to be the boom truck. The purchase date coincides with a lease of the boom truck by MMLH to BP Construction.

The record was unclear which of these items of construction equipment existed on the Petition Date, which Debtor owned, and which the Trustee seeks to be part of the estate. It is also unclear which equipment was used in the construction of the home on the Roberts Property and/or the Etna property. Even if one of Debtor's LLC entities holds legal title, the Trustee asserts the equipment is Debtor's, applying the alter ego doctrine.

---

[89] Ex. 7. Nothing in the record demonstrates Ms. McDonald perfected her security interest in the forklift.
[90] *See* Ex. 41.

III.  **Analysis and Conclusions of Law**

A.  **Property of the Estate**

The Bankruptcy Code expansively defines what constitutes property of the bankruptcy estate.[91]  Section 541(a)(1) provides:

> Such estate is comprised of all the following property, wherever located and by whomever held:
> (1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property . . . [92]

State law, however, determines the nature and extent of a debtor's interest in property.[93]  Here, Montana law governs whether Debtor had an interest in the real estate and improvements known as the Roberts Property situated in Montana. Montana law also governs the validity of the DLT-19 trust allegedly holding title to the Roberts Property. Wyoming law governs whether Debtor had a property interest in the construction equipment and the alter ego doctrine and its application to this case.

Though there is a shifting burden on whether property is property of the estate, the Trustee has the final burden of persuasion by a preponderance of the evidence that the property in question is property of the bankruptcy estate.[94]

The Code enumerates certain property interests excluded from estate property. With respect to the Roberts Property, Debtor asserts two such statutory exclusions apply here: Section 541(b)(1)'s exclusion of powers a debtor may exercise *solely* for the another's benefit, and Section 541(c)(2)'s exclusion of a beneficial interest in a trust subject to restrictions on transfer that are enforceable under applicable nonbankruptcy law, such as spendthrift trusts. Debtor highlights he never took legal title to the Roberts Property, though he purchased the real estate, built a house on the Property, and possessed and controlled the Property. In other words, he had all the other indicia of ownership.

Assuming a valid trust exists, Section 541(b)(1) is generally understood to exclude a debtor's interest in a trust as the trustee holding bare legal title to the trust property and administering the trust's terms solely for the beneficiaries' benefit.[95]  Debtor was not the trustee under any version of DLT-19, but he was named the director under both the Virginia Trust and the Montana Trust versions.

---

[91] *In re Dittmar,* 618 F.3d 1199, 1204 (10th Cir. 2010).
[92] 11 U.S.C. § 541(a)(1).
[93] *Butner v. United States,* 440 U.S. 48, 55 (1979).
[94] *See In re Mehlhaff,* 491 B.R. 898, 901 (B.A.P. 8th Cir. 2013) (once trustee makes prima facie showing property is included in estate property, burden shifts to the debtor to show it is excluded, though final burden rests on trustee); *In re Purcell,* 573 B.R. 859, 862 (Bankr. D. Kan. 2017) (preponderance of the evidence standard).
[95] *See In re Veatch,* 232 B.R. 346 (Bankr. E.D. Va. 1999) (a debtor's beneficial interest as trustee of land trust did not bring real property itself into bankruptcy estate; Section 541(b)(1) exclusion applied).

Section 541(c)(2) has been interpreted to mean a debtor's beneficial interest in a spendthrift trust is excluded entirely from the bankruptcy estate.[96] This exclusion is inapplicable here as Debtor did not have a beneficial interest under any of the trust versions, and even if he did, the beneficial interest was assignable and there were no restrictions or restraints on assignment or alienation that would make any version of the trust a spendthrift trust.

B. **Land Trusts Generally**

Debtor maintains he intended to create a "land trust" to hold title to the Roberts Property for his children's benefit. Exhibit S-BP is the DLT-19 trust instrument he contends was created on September 30, 2014. Debtor cited no legal authority that Montana expressly recognizes land trusts but asserts a land trust may be formed in any state that has adopted the Uniform Trust Code.[97] The court's independent research reveals land trusts are a creature of state statutory law and may be separate from a state's general law of trusts.[98] The following states have enacted specific statutory acts for their creation: Florida,[99] Virginia,[100] Hawaii,[101] and Illinois.[102] These statutory land trusts are a type of express trust but differ from an express trust under a state's trust code or common law trusts in several ways.

One of the key distinctions between an express trust and a land trust is that under a land trust, the trustee holds legal *and* equitable title to the trust property, while under an express trust, the trustee holds legal title to trust property and the beneficiaries hold an equitable interest in the property.[103] Under a land trust, the beneficiaries have no interest in the trust property itself; the

---

[96] *In re Hilgers,* 371 B.R. 465, 468 (B.A.P. 10th Cir. 2007).

[97] Most states have enacted the Uniform Trust Code, or some modified version thereof governing other express trusts. For example, Montana enacted a modified version of the Uniform Trust Code, effective October 1, 2013, applicable to express trusts. *See* MONT. CODE ANN. § 72-38-101, *et seq.*

[98] The court notes some states recognize various public statutory land trusts, but these type of public land trusts are excluded from the court's discussion and analysis herein.

[99] Florida Land Trust Act, FLA. STAT. ANN. §§ 689.071, 689.073 (West 2013).

[100] VA. CODE ANN. § 55.1-117 (West 2019).

[101] Hawaii Land Trust Act, HAW. REV. STAT. § 558-1 to § 558-8 (West).

[102] Illinois' statutes dealing with land trusts are found in the Property chapter 765, but are dispersed among numerous acts and sections thereunder, enacted in various years. *See* 765 ILL. COMP. STAT. ANN. 405/0.01 *et seq.* (Land Trust Beneficial Interest Disclosure Act); 407/1 *et seq.* (Land Trust Beneficiary Rights Act); 410.0.01 *et seq.* (Land Trust Successor Trustee Act); 415/0.01 *et seq.* (Land Trustee as Creditor Act); 420/1 *et seq.* (Land Trust Recordation and Transfer Tax Act); 430/0.01 *et seq.* (Sale of Residential Property Subject to Land Trust Act); and 435/1 *et seq.* (Land Trust Fiduciary Duties Act).

[103] *See, e.g.,* HAW. REV. STAT. § 558-4 (any recorded instrument transferring any interest in real property to any person qualified to act as a land trust trustee shall be effective to vest in the trustee legal and equitable title over the real property); FLA. STAT. ANN. § 689.071(3) (every recorded instrument transferring interest in real property to the trustee of a land trust, whether or not reference is made to the beneficiaries or the trust agreement, vests both legal and equitable title, and full rights of ownership, over the trust property); *FirstMerit Bank, N.A. v. Soltys,* 29 N.E.3d 568, 575 (Ill. App. 2015) (describing a land trust as an arrangement under which legal and equitable title to real property is placed in the trustee).

beneficiary's interest is generally considered a personal property interest as the beneficiary is entitled to income, rents, and profits, and the interest is transferable.[104] In addition, as Mr. Lawrence testified, the *beneficiary* under a land trust exercises control and power over the trust property and generally directs the trustee's actions, unless the beneficiary transfers direction to a third-party director.[105] The trustee's express powers and authority are actually quite limited in a land trust.[106] In an express trust, the trust document generally grants the trustee broad powers and authority over the trust property, and may commonly include the power to sell, lease, or mortgage the trust property and exercise discretion in distributing trust income.

Other differences exist between a land trust and an express trust. For all practical purposes, a land trust is a secret trust keeping the beneficiaries' identities undisclosed.[107] However, in this case, the owner of the trust property, as opposed to the beneficiaries, is hidden because Debtor, upon acquiring the Roberts Property, directed Ms. Christensen to convey it to a trust, keeping his name out of the chain of title. Debtor's only documented connection to the trust is his position as purported director and that connection is known only if the trust agreement and necessary documents are recorded. The beneficiaries need not be named in the recorded instrument conveying the land to the trustee and the beneficiaries may remain anonymous, with some trust agreements, as in this case, affirmatively prohibiting disclosure of the beneficiaries' identity.

C. **Montana Trust Law**

In general, the law of the situs of the real property determines the validity of a trust as to real property.[108] The Roberts Property is located in Montana. Montana does not have a specific land trust statute, but other statutory trust law and common law are applicable to an express trust such as the purported DLT-19 trust.

---

[104] *See, e.g.,* 765 ILL. COMP. STAT. ANN. 420/2 (stating the interest of the beneficiary is personal property only, though beneficiaries have the exclusive right to manage, control, and possess the real estate and to receive the net proceeds from rental, sale, or other disposition); VA. CODE ANN § 55.1-117 (beneficiaries' interest shall be deemed to be personal property); HAW. REV. STAT. ANN. § 558-7 (recorded instrument declaring the interest of beneficiaries to be personal property is controlling).

[105] *IMM Accept. Corp. v. First nat. Bank and Trust Co. of Evanston,* 499 N.E. 2d 1012, 1014-15 (Ill. 1986) (beneficiary exercises all rights of ownership, including possession, other than holding legal title).

[106] *See e.g.* FLA. STAT. ANN. § 689.071(c) (listing only three trustee duties: (1) to convey, sell, lease, mortgage, or deal with the trust property or exercise other powers provided in the recorded instrument, as directed by the beneficiaries or the holder of the power of direction; (2) to sell or dispose of the trust property at the termination of the trust; and (3) to perform ministerial and administrative functions delegated to trustee in the trust agreement or by beneficiaries or the holder of the power of direction).

[107] *See Redfield v. Cont'l Cas. Corp.,* 818 F.2d 596, 607 (7th Cir. 1987) ("A land trust allows the beneficiary to retain most of the usual attributes of real property ownership while affording him the advantages of secrecy of ownership and ease of transfer.").

[108] *See United States v. Crosby,* 11 U.S. 115, 116, 3 L. Ed. 287 (1812) ("title to land can be acquired and lost only in the manner prescribed by the law of the place where such land is situate"); 15A C.J.S. Conflict of Laws § 94 ("[t]he validity of an express trust of real estate is tested by the law of its situs").

1. *The Montana Uniform Trust Code*

Montana adopted a modified version of the Uniform Trust Code in 2013 (MUTC).[109] It applies to express trusts and trusts created pursuant to statute.[110] Except as provided in Section 72-38-105(2), the terms of a trust govern over the provisions of the MUTC; where the trust is silent, the MUTC controls.[111]

Section 72-38-401 of the MUTC provides three methods of creating a trust. The method applicable in this case provides a trust may be created by "transfer of property to a person as trustee during the settlor's lifetime."[112] Under this method, the settlor conveys the property to be held in trust to the trustee and establishes the trust corpus. The other requirements for a trust are enumerated in Section 72-38-402(1), and include those requirements recognized by common law:

(a) the settlor has capacity to create a trust;
(b) the settlor indicates an intention to create the trust;
(c) the trust has a definite beneficiary;
(d) the trustee has duties to perform; and
(e) the same person is not the sole trustee and sole beneficiary.

Where the trust pertains to real property, Section 72-38-1111 supplements, but does not modify the MUTC relating to the creation or validity of trusts. That statute makes clear that a conveyance of real property to a trustee, designated as such in the conveyance, vests the whole estate conveyed in the trustee (subject to the trustee's duties), and the beneficiaries of the trust take no estate or interest in the real property.[113] If the real property's recorded conveyance is to the name of a trust, the conveyance vests the estate in the trustee of the trust. The trustee's identity may be established by a *recorded* affidavit of the party serving as trustee or by another *recorded* instrument specifying the trustee's name and address, and confirming the party is currently serving as the trustee.[114] The Official Comments to Section 72-38-1111 state: "the simple designation of a grantee in a conveyance, as a trustee, with nothing more, is sufficient for conveyancing purposes and title standards, but may not be sufficient alone to create a valid trust" under the MUTC.

Unlike the Uniform Trust Code, Montana does not permit oral trusts.[115] The court has also

---

[109] *See* MONT. CODE ANN. § 72-38-101 *et seq.*

[110] *Id.* at § 72-38-102. The MUTC is supplemented by the common law of trusts and principles of equity where not modified by the MUTC. § 72-38-106.

[111] MUTC, § 72-38-105(1).

[112] *Id.* at § 72-38-401(1).

[113] MUTC, § 72-38-1111(2).

[114] *Id.* at § 72-38-1111(8).

[115] Section 407 of the UTC permits the creation of an oral trust when established by clear and convincing evidence. The Official Comment to Section 72-38-407 notes that Section § 407 of the Uniform Trust Code was not adopted by the MUTC.

considered the Uniform Directed Trust Act enacted by the Montana Legislature in 2021,[116] but concludes even if DLT-19 meets the definition of a "directed trust," the UDTA does not apply in this case because all of the conduct and actions at issue regarding DLT-19 predate October 1, 2021.[117] The court now turns its attention to the creation and validity of DLT-19 under the MUTC and common law.

### D. Validity of alleged DLT-19 Trust

#### 1. *Creation of DLT-19*

Exhibit 12, the warranty deed, is the only conveyance document purporting to transfer the Roberts Property to DLT-19. Ms. Christensen executed this deed on September 30, 2014, which she acknowledged in the presence of a notary, but it was not recorded until December 19, 2014.

Recall that when Ms. Christensen and Debtor initially acquired the Roberts Property together, Debtor instructed property title be placed solely in her name, despite his having made half the down payment. Thereafter, pursuant to the undisputed testimony, Debtor personally paid Ms. Christensen for her interest in the Roberts Property, effectively acquiring full ownership, and directed her to convey the Roberts Property to DLT-19.[118] Debtor's contribution of the Roberts Property to DLT-19 makes him the "settlor" of the purported trust under the MUTC.[119]

Under the MUTC and common law, a valid express trust is created only if: (1) the settlor has capacity to create a trust; (2) the settlor indicates an intent to create the trust; (3) the trust has a definite beneficiary; (4) the trustee has duties to perform; (5) the same person is not the sole trustee and sole beneficiary; and (6) a transfer of property to the trust occurs.[120]

#### 2. *Transfer of Property to the Trust*

The court first considers whether there has been a transfer of the Roberts Property, to make DLT-19 legally effective.[121] The MUTC codifies this common law requirement in Section 72-38-

---

[116] MONT. CODE ANN. § 72-40-101 *et seq.* (West's 2021).

[117] *See* UDTA, § 72-40-103(1).

[118] Though "Diamond Land Trust" was the purported buyer of Christensen's interest in the Roberts Property, and Debtor signed the contract as "Buyer Trustee," no such trust existed. *See* Ex. 8. Debtor's role, if any, under any version of DLT-19 admitted into evidence was that of a director, with the power of direction over the trustee. The court therefore concludes Debtor personally acquired the Roberts Property before he directed Christensen to convey it to DLT-19.

[119] *See* MUTC, § 72-38-103(18) defining "settlor."

[120] MUTC, §§ 72-38-401(1) and 402(1).

[121] *See McCormick v. Brevig,* 980 P.2d 603, 612-13 (Mont. 1999) (noting an effective property transfer is required under common law to make the trust legally effective (citing § 32 of Restatement (Second) of Trusts (1959) requiring the owner of property to make a conveyance inter vivos of the property "to another person to be held by him in trust for a third person. . . .")); *Cate-Schweyen v. Cate,* 15 P.3d 467, 473 (Mont. 2000) (finding absent an actual conveyance or transfer of property, the trust remains a "phantom" or "dry" trust and unenforceable; the undisputed facts revealed the trust property was never delivered, or conveyed, or transferred to the named trustee).

401(1), which provides: "A trust may be created by: (1) transfer of property to a person *as trustee* during the settlor's lifetime. . . ."[122] This is consistent with the general rule requiring a transfer be to a person designated as trustee.[123] Here, Ms. Christensen conveyed the Roberts Property to "Diamond Land Trust-19" as Debtor directed, and not to Ms. Barnes as a trustee. The Roberts Property was not conveyed to a person *as trustee.*

> However, the MUTC contains the following language:
>
> The designation of the name of a trust in a recorded conveyance vests the estate in the trustee of the trust. A subsequent conveyance may be made by the trustee. The identity of a party serving as trustee may be established by a recorded affidavit of the party or by another recorded instrument specifying the trustee's name and address and confirming that the party is currently serving as the trustee.[124]

Debtor argues the warranty deed transferring the Roberts Property to DLT-19 directly was sufficient. However, he ignores the second part of the above provision, which also involves the trustee of the grantee trust to be identified through a recorded affidavit or other recorded document identifying the trustee. No such recording ever occurred.[125]

Though Debtor may view this as a technicality, the requirement is clear under the MUTC and is logical. A trust does not hold title to trust property; the trustee holds legal title to the trust property in trust (and will therefore be in the chain of title to the trust property) and is authorized to exercise the trustee's duties under the trust instrument. Because a trust agreement is normally not required to be recorded, only by a conveyance to the trustee can third parties dealing with the trust know they are dealing with the person authorized to administer the trust and rely upon that person's authority to deal with the trust property. The confusion over the identity of the trustee and the person authorized to deal with the trust property, is precisely the marketable title problem identified by the underwriters for title insurance when Debtor was trying to procure a loan for DLT-19 and later when he was trying to sell the Roberts Property.

In addition, the various trust instruments themselves dictate title to the Roberts Property must be placed in the trustee. The September 30, 2014 one-page "Trust Agreement" states: "When

---

[122] Emphasis added.

[123] *See, e.g.,* FLA. STAT. ANN. § 689.071(3) ("Every recorded instrument transferring any interest in real property *to the trustee of a land trust* and conferring upon the trustee the power. . . ." (Emphasis added). In addition, Florida defines "trust property" as "any interest in real property . . . conveyed by a recorded instrument *to a trustee of a land trust* or other trust." § 689.071(2)(g) (Emphasis added). *See also* Haw. Rev. Stat. Ann § 558-4 ("*Any recorded instrument transferring any interest in real property in this State . . . to any person . . . qualified to act as a trustee in this State* . . . shall be effective to vest in the trustee legal and equitable title over the real property. . . .) (Emphasis added).

[124] MUTC, § 72-38-1111(8).

[125] There does not appear to be any similar exception for deeds to trusts in Virginia law. Regardless, Debtor does not contend the Virginia Trust version is the applicable trust.

the trustee has taken title to the real estate or has accepted in writing title to any other property conveyed to it *as trustee* hereunder, the trustee will hold it. . . ."[126]  The so-called Virginia Trust provides the titling of any deed to real property "in the name of the Trustee, as Trustee of this trust, or any successor Trustee of this trust" is deemed to be a transfer to such trust.[127] The so-called Montana Trust contains an identical provision.[128]

More problematic is no valid trust document existed at the time Ms. Christensen conveyed the Roberts Property or the conveyance recording that created and/or identified the DLT-19 trust. The September 30, 2014 "Trust Agreement" identifies Ms. Barnes as "about to take legal and equitable title" to the Roberts Property but makes no references to DLT-19. The Agreement identifies the trust purposes as those "herein stated" but none are included; there is no trust named within the instrument, nor any beneficiary identified, and portions of the document are incomplete.

The court understands Debtor argues Exhibit S-BP, the Montana Trust Agreement, must be read in conjunction with the one-page September 30, 2014 Trust Agreement. However, the court finds the evidence contradicts the existence of this Montana Trust prior to November 2015. First, when Debtor and Ms. Barnes requested Mr. Lawrence to draft the Virginia Trust, they only provided him with the one-page September 30, 2014 Trust Agreement.[129] Debtor and Ms. Barnes sought Mr. Lawrence's assistance because they encountered difficulty with the title company and procuring the DLT-19 loan with only the one-page Trust Agreement. This is consistent with Mr. Lawrence's testimony that he only saw the one-page Trust Agreement and had he possessed the full Montana Trust Agreement, he would have understood Ms. Barnes, as the named trustee therein, did not have authority to amend the trust. Mr. Lawrence also testified the Montana Trust document uncannily mirrors the Virginia Trust version he drafted. The email correspondence with the title companies during the refinance attempts show Debtor and Ms. Barnes only had the one-page Trust Agreement until they were provided the Virginia Trust.[130]

The court concludes that because the September 30, 2014 warranty deed conveying the Roberts Property was not conveyed "to a person as trustee" or to a valid trust with a recorded instrument identifying the trustee of DLT-19, the warranty deed was ineffective to transfer the Roberts Property to DLT-19, nor did such conveyance create a trust. Nothing in the various versions

---

[126] Ex. 13. No reference to DLT-19 is made in this Agreement, rendering it unclear whether this instrument even pertains to that trust.

[127] Ex. 21, ¶ 1.4.

[128] Ex. S-BP, ¶ 1.3. This trust instrument further provides the trustee shall take title to property under the laws of Montana. ¶ 9.5.

[129] Mr. Lawrence did receive a copy of the Montana Trust at some point, but it was long after he drafted the Virginia Trust. Consistent with his testimony, the Virginia Trust on its face only amended the one-page Trust Agreement, Exhibit 13.

[130] Ex. 20.

of the written trust instruments saves this defect in the conveyance. Because no other deeds conveying the Roberts Property to a trust were entered in evidence, whatever version of the DLT-19 trust instrument the court considers, those purported trusts suffer the same defect.

The court concludes the conveyance by warranty deed to the trust was ineffective to transfer the Roberts Property to a trust and did not create DLT-19. Notwithstanding this conclusion, the court will address whether other requirements for a valid trust are lacking.

3. *Other Requirements to Create a Valid Trust*

There is no contention Debtor lacked the capacity to create DLT-19. None of the trust instrument versions designate the same person as the sole trustee and sole beneficiary. To satisfy the statute of frauds, the trust must be evidenced by a written instrument signed by the trustee or the settlor.[131] Each version of the trust instrument is signed by the named trustee. That leaves the remaining requirements for a valid trust: the settlor indicates an intent to create the trust; the trust has a definite beneficiary; and the trustee has duties to perform. These requirements are typically established by the trust instrument.

a)   The One-Page Trust Agreement dated September 30, 2014 (Exhibit 13)

Ms. Barnes signed this trust instrument as trustee. Although there is no requirement *per se* to "name" the trust, the failure to identify the trust as DLT-19 makes it impossible to link the conveyance of trust property to this trust, absent attachment or reference to the deed of conveyance.

Debtor's intent, as settlor, to create a trust to hold legal title to the Roberts Property would have been easily established had he executed this trust instrument as settlor. Generally, courts look to the trust instrument to determine intent. "[W]e continue to cite to the general rule that in the construction of trusts it is the trustor's intent that controls and that to determine that intent we look to the language of the trust agreement."[132] "[E]xpress trusts depend for their creation upon a clear and direct expression of intent by the trustor."[133] The one-page document itself is insufficient to find any intent to create a trust as it lacks a definite beneficiary and trust duties.

Debtor testified he intended to create a trust to hold the Roberts Property for the benefit of his children. Again, the evidence contradicts this intention. First, no child is listed as a beneficiary until the Montana Trust Agreement, and the court has rejected Debtor's contention such Agreement existed prior to November 2015. Naming Ms. Barnes as beneficiary in the Virginia Trust version also directly contradicts this intention. When he could not obtain financing, Debtor's preferred solution was to terminate the trust and transfer the Roberts Property to Ms. Barnes individually. Ms.

---

[131] MUTC, § 72-38-407.
[132] *Matter of Est. of Bolinger*, 943 P.2d 981, 985 (Mont. 1997).
[133] *Eckart v. Hubbard*, 602 P.2d 988, 991 (Mont. 1979).

Barnes, who worked with Debtor to create the trust documents, explained to Mr. Lawrence her intent and attempt to deed the Property to Debtor.[134] Had the children been the intended beneficiaries, the proper course of action would have been to deed the property to them.

Most importantly, Debtor treated the Roberts Property as his own—he never intended to give his children a beneficial interest. Instead, Debtor remained in control of the Property, improved the Property, attempted to obtain financing, attempted to sell the Roberts Property, and placed the rent proceeds in his solely owned LLC. It is apparent Debtor sought to conceal his ownership of the Roberts Property by keeping his name out of the chain of title. In a genuine land trust, Ms. Wait, as the primary beneficiary, would have had complete control over the Property and its proceeds. However, she stipulated she had no knowledge of any purported trust that named her as beneficiary of the Roberts Property.[135] Without knowledge, she never could have authorized any transactions related to the Roberts Property.

The initial one-page trust instrument, apart from holding title to the trust property "for [unspecified] uses and purposes" and "executing deeds, mortgages or other instruments" does not specify the trustee's duties and purports to incorporate by reference unknown, future trust terms and provisions.  Lastly, this trust instrument does not name a definite beneficiary or the "power of direction." The failure to name a beneficiary of this trust is fatal to its creation under Section 72-38-402(1)(c) of the MUTC. Since the one-page Trust Agreement is not a valid trust, equitable title to the Robert's Property remained with Debtor.

b)   "Amendment" to Trust Agreement (Exhibit 21 – Virginia Trust)

Debtor was the identified director of the purported Virginia Trust, and Citi was the trustee under the trust instrument executed in November of 2015. Julie Barnes was listed as the sole beneficiary, despite Debtor's argument he intended to create a land trust for the benefit of his children. As noted above, the Roberts Property was never conveyed to this trust because no deed was ever executed to Citi as trustee of the Virginia Trust. Nor could Ms. Barnes have conveyed title to the trust.

The only other requirement in question with respect to the purported Virginia Trust is Debtor's intent to create it. Again, Debtor's intent to create this trust would have been established by him executing it as settlor in 2015. He did, however, sign the trust instrument, accepting his appointment as director of the trust "with the power of direction over the aforesaid trust together with my fiduciary [*sic*] to each and all of you [beneficiaries]."[136]

---

[134] Barnes Exs. CCC and DDD.
[135] *See* ECF No. 14.
[136] Ex. 21 at p. 20. Debtor acknowledged his execution of the instrument in the presence of a notary.

At trial, Debtor denied the Virginia Trust was the governing DLT-19 trust instrument. However, his contemporaneous actions and communications with the trustee's manager, Mr. Lawrence, suggest Debtor treated the Virginia Trust as the operative DLT-19 trust instrument between the period 2015-2018. It was this trust instrument Debtor and Ms. Barnes eventually presented to the title insurance company and the underwriters to establish marketable title to the Roberts Property in their attempts to obtain a loan and to sell the trust property.

Ultimately, all affected parties, Debtor, Ms. Barnes, and Mr. Lawrence, acknowledge the Virginia Trust was never valid.

> c) Land Trust Agreement (Exhibit S-BP, pp. 1-27 also identified as Exhibit 24 – Montana Land Trust)

Debtor was the named director of the purported Montana Trust. Ms. Barnes was the named trustee under this version of the trust instrument. Rebecca Wait was the named beneficiary. Again, though this trust is identified as DLT-19, the Roberts Property was never conveyed to Ms. Barnes as trustee of this trust, nor was any document recorded identifying her as the trustee.

As noted with respect to Exhibit 13, Debtor's intent to create this trust would have been easily established had he executed this trust instrument as settlor. Debtor's signature appears nowhere on Exhibit S-BP that would signify his intent to create this trust; his only disclosed relationship to the trust was his identification as trust director, having the power of direction over the trustee, instead of the beneficiary.

Though the named beneficiary is Debtor's daughter, Rebecca Wait, that designation is illusory. Ms. Wait was unaware of "the purported trust" naming her as sole beneficiary, had no part in its creation, and therefore had no part in approving Debtor as director. She also waived any interest in any alleged trust. At no time did Ms. Wait recognize her purported beneficial interest in this trust, receive the rent or income from the trust property, or exercise any power or rights as beneficiary with respect to this trust or the trust property. She did not sign this trust instrument.

> d) Composition and Validity of DLT-19 claimed by Debtor (Exhibit S-BP)

Exhibit S-BP is the trust instrument Debtor (and Ms. Barnes) contend is the validly created and effective DLT-19 trust document. As noted at the beginning of this opinion, this 29-page trust instrument consists of a 27-page Land Trust Agreement (previously referenced as the Montana Trust),[137] a one-page Schedule of Trust Property attached to and made a part of the Land Trust Agreement, describing the Roberts Property,[138] and Exhibit 13—the one-page Trust Agreement dated September 30, 2014 (this last page of the document was not admitted into evidence at trial as a

---

[137] *Id.* at pp. 1-27.
[138] *Id.* at p. 28.

part of Exhibit S-BP, however).[139] Ms. Barnes allegedly signed each of these components as trustee on the same date – September 30, 2014. However, Ms. Barnes did not acknowledge her signature or execute any of these components in the presence of a notary on September 30, 2014.

What is not attached to this trust instrument is the Christensen warranty deed conveying the Roberts Property to DLT-19. We know the warranty deed existed on September 30, 2014, because that is the date Ms. Christensen signed the deed *and* acknowledged her execution of the deed in the presence of a notary, though the deed was not recorded until three months later.[140]

The court's previous analysis of the legal requirements under Montana law to create a valid trust with respect to the individual components (Exhibits 13 and S-BP, pp. 1-27) will not be repeated here, other than to note two points. There is no evidence before the court to establish Debtor intended to create this trust on September 30, 2014, because he did not sign the trust instrument as settlor. The trust agreement itself states that it "shall be effective immediately on execution by all the parties."[141] The agreement was signed only by Ms. Barnes as "trustee." It was not signed by the beneficiary Rebecca Wait, whom we now know had no knowledge of the creation of DLT-19 or her being named the sole beneficiary. It was not signed by Debtor as director, who purportedly had full authority over the trustee and management and control over the Roberts Property. An effective transfer of property to the trustee is still lacking. The inclusion of a Schedule of Trust Property, "accepted" by Barnes as trustee does not cure that legal requirement.

The court is also troubled by other aspects of Exhibit S-BP. Debtor's and Ms. Barnes' claim at trial that Exhibit S-BP is the applicable version of DLT-19 hinges on their contention this trust was created when Ms. Barnes allegedly signed the Land Trust Agreement on September 30, 2014. That testimony was neither persuasive nor credible, given their conduct and actions after September 30, 2014—some of which is inexplicable, and other evidence in this case, summarized above and below:

- Exhibit 13, the one-page Trust Agreement, suggests the conveyance of the Roberts Property is about to occur, and unidentified additional trust terms are incorporated as part of Exhibit 13. Exhibit 13 makes no reference to the Land Trust Agreement, though allegedly executed the same day, and the Land Trust Agreement makes no reference to Exhibit 13, nor does it indicate it amends or modifies Exhibit 13. Exhibit 13 would appear to be superfluous if it and the Land Trust Agreement were executed on the same day. The Christensen deed to DLT-19 was also executed on September 30, 2014.

- The court is not persuaded Ms. Barnes, as trustee, executed the Land Trust Agreement on September 30, 2014. Because the signature page of the Land Trust Agreement appears on an undated, separate page from the body of the Agreement and was not

---

[139] Ex. S-BP at p. 29.
[140] Ex. 12.
[141] Ex. S-BP at p. 1.

acknowledged in the presence of a notary on September 30, 2014, the date of its execution could easily be manipulated by simply adding a blank signature page to the Agreement, which Debtor and Ms. Barnes prepared.

- Ms. Barnes' subsequent acknowledgment before a notary on November 24, 2015 of her *signature* and *execution* of the Land Trust Agreement, does not establish she executed it on September 30, 2014.[142] That could have been proven by acknowledging her execution of the Agreement in the presence of a notary on September 30, 2014, which did not occur. In fact, no version of the Land Trust Agreement executed before the 2015 acknowledgment was ever introduced into evidence.

- If Exhibit S-BP was the valid trust instrument in place on September 30, 2014, as Debtor and Ms. Barnes contend, that begs the question: What was the purpose of amending Exhibit 13 and drafting the Virginia Trust (Exhibit 21) in November of 2015, a very similar document? Ms. Barnes signed and acknowledged her execution of Exhibit 21 as "Creator/Grantor" and as the 100% Beneficiary on November 11, 2015, and Debtor signed and acknowledged his acceptance of the appointment as director with the power of direction over the trust on the same date. Ms. Barnes also "accepted" the Schedule of Trust Property as trustee on November 11, 2015, though she was not the trustee under the Virginia Trust, Citi was.

- The undisputed evidence established that when Mr. Lawrence was asked to amend the DLT-19 Trust Agreement dated September 30, 2014 with the Virginia Trust (Exhibit 21), Ms. Barnes provided him the data sheet (Exhibit 16). There was no evidence Exhibit S-BP (the alleged governing trust instrument) was ever provided to Mr. Lawrence; his uncontroverted testimony was he had not seen Exhibit S-BP until this litigation began.[143] In short, Mr. Lawrence believed he was amending Exhibit 13, the one-page Trust Agreement dated September 30, 2014.

- The existence of DLT-19 purportedly created on September 30, 2014 (Exhibit S-BP) was never disclosed to Rebecca Wait, the named beneficiary thereunder. Though her power of direction over the trustee was transferred to her Debtor father at the inception of the trust, she retained the beneficial interest—her right to the rents and income from the trust property, payable upon her written request.[144] No rent collected by Debtor or the trustee from leasing the Roberts Property was ever transferred to the trust and/or distributed to the beneficiary. Debtor instead endorsed it to his own wholly owned LLC.

- Neither Debtor nor trustee Barnes acted as though Exhibit S-BP was the controlling trust document. As detailed previously, when they attempted to obtain construction financing in 2015 and the title company sought the complete trust document to ascertain the trustee's authority to deal with the trust property, there was no evidence presented they produced Exhibit S-BP to the title company. Nor was any evidence presented that Debtor or Barnes provided Exhibit S-BP to the title company in 2018 to prove marketable title to sell the Roberts Property. Yet according to them, DLT-19 was created and had been in place since 2014.

---

[142] *See* notes 75 and 76, *supra.*

[143] In an email dated August 18, 2018, it appears Ms. Barnes provided a copy of the Montana Agreement to Mr. Lawrence. He does not dispute receiving the email but does not recall seeing the Montana Agreement.

[144] Ex. S-BP, ¶¶ 2.4(b) and 3.1.

Based on the foregoing circumstances, coupled with the ineffective transfer of the Roberts Property to the DLT-19 trustee, the court remains unconvinced DLT-19 was validly created on September 30, 2014, by Exhibit S-BP or otherwise. In the absence of a legally created trust, the Roberts Property is not held in trust. Debtor holds all the indicia of ownership save legal title, and the court concludes Debtor became the owner of the Roberts Property on September 30, 2014 and such property is property of the bankruptcy estate.

### E.  Alter Ego Doctrine/Reverse Piercing the Corporate Veil

Alternatively, even if DLT-19 were legally created and effective on September 30, 2014, the court considers whether its existence should be disregarded as Debtor's alter ego to permit creditors to "reverse pierce" the veil and reach the trust assets to satisfy Debtor's debts.[145] Here, the court concludes  DLT-19 was not legitimately established as an estate planning tool but was established to hide the Roberts Property from Debtor's creditors and prevent them from reaching his most valuable asset.[146]

1.  *Wyoming Law*[147]

The alter ego doctrine is an equitable doctrine under which an entity's separate legal existence may by disregarded and deemed the alter ego of the person owning and controlling it.[148] The doctrine is usually applied to corporate entities and their owners, but may be applied to trusts.[149] This court previously explained the Wyoming Supreme Court recognized reverse piercing for corporations and would likely extend the theory to LLCs.[150] The court is not aware of any Wyoming law limiting a party's ability to pierce a trust whether in the traditional sense or through reverse piercing.

---

[145] *See generally* Acceptance and Application of Reverse Veil-Piercing—Third-Party Claimant, 2 A.L.R. 6th 195 (2005) (explaining distinction between traditional veil piercing and reverse veil piercing and their application); *Towe Antique Ford Foundation v. I.R.S.,* 999 F.2d 1387 (9th Cir. 1993) (applying reverse piercing under Montana law).

[146] *See* Debtor's Official Form 106 – Summary of Your Assets and Liabilities.

[147] Montana law regarding the alter ego doctrine is substantially the same. *See Berlin v. Boedecker,* 887 P.2d 1180, 1188 (Mont. 1994); *Businger v. Storer (In re Storer),* 380 B.R. 223, 233-34 (Bankr. D. Mont. 2007).

[148] *State ex rel. Christensen v. Nugget Coal Co.,* 144 P.2d 944, 948-49 (Wyo. 1944) (recognizing general rule of law that a corporation is a separate entity distinct from its owners).

[149] *See United States v. Badger,* 818 F.3d 563, 572 (10th Cir. 2016) (stating that alter-ego theory does not except trusts from its application and does not depend on the manner of entity); *United States v. Krause (In re Krause),* 637 F.3d 1160, 1164-65 (10th Cir. 2011) (discussing subtle difference between a trust as a nominee and trust as debtor's alter ego under reverse veil piercing). *See also M.J. v. Wisan,* 371 P.3d 21, 35-36 (Utah 2016). (recognizing reverse veil piercing in the trust context but declining to apply under the facts of the case); *In re Felice,* 494 B.R. 160, 175 (Bankr. D. Mass. 2013) (recognizing under Massachusetts law creditors' ability to reach trust assets where debtor has such pervasive control over the trust as to treat the property as his or her own); *In re Maghazeh,* 310 B.R. 5 (Bankr. E.D.N.Y 2004) (applying New York alter ego theory to pierce trust and enable chapter 7 trustee to bring trust assets into bankruptcy estate).

[150] *Whitmire v. Wolf* (*In re Wolf*) Doc. 89, No. 19-2008 (Wyo. Bankr. July 28, 2020).

The determination is a fact-specific inquiry and its application is appropriate to prevent fraud, evasion of a statute, injustice, or an inequitable result, or its application furthers public policy.[151] The courts consider and weigh an array of factors in determining whether to disregard an entity, including those applicable here in the trust context: (1) the individual's control over the entity [trust]; (2) observance of trust formalities; (3) whether the trust is truly a separate entity; (4) failure to segregate funds of the trust; (5) use of the trust as a mere shell, instrumentality or conduit of an individual; and (6) disregard of legal formalities.[152]

    2. *Application to Facts*

Standing alone there is nothing improper about transferring property to a trust to be administered according to a trust instrument, even if the goal is to lawfully shield assets from creditors. As with any legally recognized entity, those that use them are required to observe their formalities and rules to receive the favorable treatment or protection sought. Based on the evidence, Debtor and Ms. Barnes spent a lot of time trying to set up a valid express trust to hide Debtor's ownership and control of the Roberts Property and to protect it from the reach of his creditors. But once "established," Debtor largely ignored the trust to suit his needs.

The timing of DLT-19's alleged creation is telling. Debtor's business relationship with Mr. Bishop in the BP Construction venture had ended unceremoniously and Mr. Bishop was set on suing Debtor. Debtor had executed a Trust Indenture and Collateral Assignment of his interest in the Roberts Property in favor of Mr. Bishop to secure Mr. Bishop's personal loan for construction of the Roberts home, but within two months of recording the Bishop Indenture, Debtor and Ms. Barnes recorded and filed the false RM Funding loan documents and indenture. In short, Debtor's financial troubles were coming to a head, and the Roberts Property was his only asset of any significance.

Debtor never disclosed the existence of DLT-19 to his daughter—the sole beneficiary. The beneficiary had the right "to receive the net proceeds from rental or other income, mortgages, net gain from sales or other dispositions of the real property", payable only upon the beneficiary's written request.[153] Not knowing the existence of the trust or that she had been named a beneficiary, it was impossible for Ms. Wait to exercise any rights she had as a beneficiary. If DLT-19 was truly an

---

[151] *Nugget Coal Co.,* 144 P.2d 944, 950 (1944) (noting proof of an intent to defraud is unnecessary).

[152] See Kloefkorn-Ballard Const. and Development, Inc. v. North Big Horn Hosp. Dist., 683 P.2d 656, 661 (Wyo. 1984) (citing Amfac Mechanical Supply Co. v. Federer, 645 P.2d 73, 77 (Wyo. 1982), abrogated on other grounds by Texas West Oil and Gas Corp. v. First Interstate Bank of Casper, 743 P.2d 857 (Wyo. 1987)). See also Daniels v. Kerr McGee Corp., 841 F. Supp. 1133, 1136 (D. Wyo. 1993); Towe Antique Ford Foundation, supra at 1391 (identifying six factors relevant to the alter ego inquiry).

[153] Ex. S-BP, ¶ 2.4(b).

estate planning device, Debtor would have disclosed to his daughter her beneficial interest under the trust and her rights as a beneficiary, and DLT-19 would have distributed all income to her.

In analyzing land trusts, courts "look through the form [of an Illinois land trust] to the substance of a transaction."[154] Similarly, the Seventh Circuit explained substance should prevail over form in Illinois-type land trusts.[155] However, those cases generally find the beneficiary is the true owner despite the trustee holding legal title.

> Disregarding the form of an Illinois land trust has led those courts to conclude that for various purposes it is the beneficiary who is the owner of the real estate. That conclusion is derived from the fact that it is the beneficiary who has the right to control and manage the property and receive all the proceeds of the property. The land trustee acts only at the direction of the beneficiary. *It is these attributes of control that determine who is the true owner of property and not legal fictions created to facilitate land transfers.*[156]

Such is usually the result because the beneficiary exercises true control over the property. "While title may be a factor in determining ownership it is not decisive. Of far greater importance is control of the property and the right to its benefits."[157] Here, the beneficiaries never exercised control over the Roberts Property—at least one had no idea of her role as beneficiary. In contrast, Debtor has consistently exercised control over the Roberts Property, including attempting to finance, sell, and lease it and exercising control over the rental income.

As director, Debtor had the sole power of direction and control over the trustee of DLT-19, and effectively the Roberts Property itself. That power of direction was required to be exercised in writing and in some circumstances approved in writing. The evidence is nonexistent that any party at any time provided written direction authorizing a sale, lease, borrowing, mortgage, or any other action with respect to the Roberts Property.[158] Only the trustee had authority, if directed in writing, to execute notes and mortgages, and leases and sales of the trust property. Debtor had no authority to execute contracts individually or as director on behalf of DLT-19.[159] Debtor simply acted in whatever way benefitted him personally.

In his dealings with third parties to attempt to obtain a loan or to sell and convey title to the Roberts Property, Debtor never submitted Exhibit S-BP as the controlling trust document (supposedly in effect from 2014 on) to satisfy title requirements and clear exceptions noted by the

---

[154] *In re Langley,* 30 B.R. 595, 599 (Bankr. N.D. Ind. 1983).

[155] *In the Matter of Pentell,* 777 F.2d 1281, 1284 n. 2 (7th Cir.1985).

[156] *In re Ainslie & Belle Plaine Ltd. P'ship,* 145 B.R. 950, 955 (Bankr. N.D. Ill. 1992) (emphasis added).

[157] *People v. Chicago Title & Tr. Co.*, 389 N.E.2d 540, 545 (Ill. 1979).

[158] Ex. S-BP, ¶ 4.1(a)-(c), ¶ 4.2.

[159] *See e.g.* Ex. 34 (July 14, 2018 Hathaway lease of Roberts Property executed by Debtor as Director of DLT-19, the landlord); Ex. 35 (July 14, 2018 Purchase Price Agreement between Debtor as intended seller of Roberts Property and Hathaway as intended buyer).

title insurance company to convey marketable title. As late as July 2018, Ms. Barnes and Debtor proceeded as though the Virginia Trust instrument was the governing trust agreement, not Exhibit S-BP. Under the Virginia Trust instrument, Ms. Barnes was the sole beneficiary, Citi was the trustee, and Debtor the director. Although only needing written authority from the beneficiary, Debtor, instead, sought a limited power of attorney from the trustee Citi to enter into the Hathaway lease on the Roberts Property.[160]

Debtor collected rents from leasing the Roberts Property but did not turn over those funds to the trustee to hold for distribution to the sole beneficiary. A separate bank account for DLT-19 was never established, nor were rents segregated from Debtor's personal or LLC accounts.

Debtor lived in the Roberts Property rent-free, sometimes with the trustee Ms. Barnes, without written direction. No lease was executed by the DLT-19 trustee with Debtor. DLT-19 is revocable.[161] But ¶ 9.2 (b) of the purported Montana Trust instrument specifies a 20-year trust term. The trust agreement provides that only the beneficiary, not the trustee, may terminate the trust at any time.[162] That power is illusory where the beneficiary is unaware of the trust and her designation as the sole beneficiary and has disclaimed any interest in DLT-19. It is further illusory when Debtor seeks to remove the Roberts Property from the trust into his name so he can sell it, and the purported trustee Ms. Barnes wishes to deed the property to Debtor to resolve their relationship dispute.

In substance, Debtor treated and dealt with the Roberts Property as his own and without regard to any DLT-19 trust terms, which Debtor intended to be kept secret.[163] DLT-19 should be disregarded as Debtor's alter ego to further the Bankruptcy Code's policy to reserve bankruptcy relief for the honest but unfortunate debtor. To recognize DLT-19 as a separate trust entity and exclude the Roberts Property from the bankruptcy estate would work an injustice and inequitable result on Debtor's creditors, some of whom relied on his portrayal as owner of the Roberts Property.

F. **Revocability of DLT-19**

In any event, even if DLT-19 were legally created and effective on September 30, 2014, the court finds DLT-19 was revocable by Debtor as the settlor. Under Montana law, "unless the terms of a trust expressly provide that the trust is irrevocable, the settlor may revoke or amend the trust."[164]

---

[160] *See* Ex. 34 (Hathaway lease agreement with DLT-19, "c/o Citi Trustee Services.") and Ex. 36.
[161] Ex. S-BP, ¶ 1.1.
[162] *Id.* at ¶¶ 9.2(a) and (c).
[163] *See* Exhibit S-BP, ¶ 4.6 (trustee is duty-bound never to reveal the name of the beneficiary nor allow anyone to view the trust agreement without unanimous written consent of the beneficiaries or a written court order); ¶ 6.1 (trustee is prohibited from releasing information regarding the trust or its beneficiaries); ¶ 6.2 (third parties dealing with the trustee are not permitted to make inquiry into the trustee's authority to act nor inquire into any of the terms of the trust); ¶ 9.1 (the trust agreement shall not be placed of record in the recorder's office in the county in which the trust property is situated or elsewhere).
[164] MUTC, § 72-38-602(1).

The one-page Trust Instrument dated September 30, 2014 did not so provide, and the two other versions of the trust document introduced at trial, the Virginia Trust and the Montana Trust (Exhibit S-BP), both state the trust is revocable. Both trust versions prevent the trustee from revoking or terminating and grants the beneficiaries the right to do so. However, both are also silent as to the settlor's (Debtor's) right to revoke. Given the presumption and lack of language stating otherwise, Debtor continued to have the power to revoke. That power to revoke became the Trustee's to exercise upon the Petition Date, under Section 541 of the Bankruptcy Code.

### G. Construction Equipment

What little detail was provided to identify the construction equipment used in Debtor's business ventures is set forth in the court's findings of fact. The record did not establish which construction equipment existed on the Petition Date, nor specifically what entity held title.

Debtor disclosed in his Bankruptcy Schedules his ownership interests in the three limited liability companies he was involved in: MMLH, MW Design, and BP Construction. Debtor was not required to disclose those LLCs' assets. Thus, if the construction equipment was in fact owned by one of the LLCs, it is not property of the individual Debtor's bankruptcy estate and the court would not expect it to be listed in Debtor's bankruptcy forms.

It appears none of the construction equipment previously described was acquired in 2016 or later. That eliminates MW Design (formed in 2016) as the owner of the construction equipment, absent a transfer of the equipment to MW Design. There was no evidence of any transfers of construction equipment. Based on the agreement between Mr. Bishop and Debtor when BP Construction was formed in 2012, BP owned no construction equipment; as part of their deal, Debtor was to provide the construction equipment for building the North Dakota homes.[165] This eliminates BP as the owner of the construction equipment.

MMLH leased the following equipment to BP for $3,000 per home built pursuant to an equipment lease agreement dated February 1, 2012: a skid steer, a JCB forklift, and the following "tools"—table saw, chop saw, tile saw, nail guns, and miscellaneous construction tools.[166] However, the court notes Debtor scheduled the "tools" on his Bankruptcy Schedule A/B and claimed them exempt as tools of the trade on Schedule C. Four months later, Debtor executed a second equipment lease agreement between MMLH, as lessor, and BP, as lessee, for a 9-ton boom truck that provided for a monthly lease payment of $2,200 plus costs to deliver the truck to North Dakota, insurance, maintenance, and damage.[167] Notwithstanding that Mr. Bishop asserts he was unaware of the

---

[165] See Ex. 41 specifically referencing a Bobcat and Loadal [sic].
[166] Ex. 43. Debtor signed the equipment lease both as manager of MMLH and as member of BP.
[167] Ex. 42 (June 19, 2012, Equipment Lease Agreement).

equipment leases and BP was not responsible for these construction equipment costs under the terms of the BP Agreement, the leases suggest Debtor considered MMLH to own the itemized equipment.

In short, the documentary evidence presented at trial indicates MMLH is the owner of the skid steer/Bobcat, a JCB forklift, a 9-ton boom truck, a loadall, and a flatbed trailer to the extent they existed on the Petition Date. The fact MMLH had been administratively dissolved according to state records does not negate MMLH's ownership of the equipment. As this court previously held, an LLC does not cease to exist upon administrative dissolution and the LLC's assets do not automatically become the members' assets.[168]

That does not end the inquiry, however. As with DLT-19, the Trustee asks this court to invoke the alter ego doctrine and reverse pierce MMLH and recover the construction equipment as property of the estate. That request appears to be based on Debtor's control and use of the construction equipment to build the home on the Roberts Property. Under circumstances where the Debtor is engaged in the construction business and is building a home on his property, the court does not find this inappropriate or surprising.

Case law emphasizes the alter ego doctrine and piercing and reverse piercing of corporate entities are to be exercised sparingly.[169] Even if the Trustee demonstrates Debtor is the alter ego of MMLH, the second prong to disregard the corporate entity requires proof that reverse piercing should be applied to prevent inequitable conduct, fraud, or an injustice. The court's review of the entire trial record leads it to conclude the Trustee has simply not met his burden of proof on this claim.

IV.    **Relief to be Granted to the Trustee**

Having concluded DLT-19 was never validly created because the conveyance of the Roberts Property by Christensen's warranty deed was ineffective to transfer the property to DLT-19, the court evaluates the parties' positions on the Petition Date. Debtor was the sole equitable owner of the Roberts Property by virtue of having acquired Ms. Christensen's interest prepetition, and by having all other indicia of ownership. Ms. Christensen still held bare legal title to the Roberts Property (as Debtor had directed when they acquired it). Absent a valid trust, none of the other defendants sued in their capacity as trustee or beneficiary in this proceeding had an interest in the Roberts Property on the Petition Date. And there was no evidence any of the other defendants had

---

[168] *See Hager Industries, Inc. v. Aylesworth (In re Aylesworth),* Adv. No. 20-2005, 2021 WL 261382, at *3 (Bankr. D. Wyo. Jan. 22, 2021) (citing *In re Jorgensen,* No. 11-20046, 2011 WL 6000871 (Bankr. D. Wyo. Nov. 30, 2011)).

[169] *See GreenHunter Energy, Inc. v. Western Ecosystems Technology, Inc.,* 337 P.3d 454 (Wyo. 2014) (piercing the veil of a limited liability company is "the rare exception" to be applied only in "exceptional circumstances").

an interest in the Roberts Property in their individual or corporate capacity on the Petition Date. The Christensen warranty deed to DLT-19 constitutes a cloud on the Roberts Property title.

In his seventh cause of action, the Trustee sought a declaration Debtor was the sole owner of the Roberts Property under Montana law and quieting title in him; the court has now concluded Debtor was the sole equitable owner of the Roberts Property under Montana law and the Trustee, standing in Debtor's shoes, can quiet title in the Roberts Property.[170]

Under Montana law, a person in possession of, and person claiming an equitable interest in real property, are both entitled to pursue a quiet title action.[171] Moreover, incidental and necessary to the purpose of quieting title, the court has authority to remove clouds on title and to cancel instruments of title in the quiet title framework.[172] The court therefore concludes the Christensen warranty deed to DLT-19 recorded on December 19, 2014, Exhibit 12, is hereby canceled and removed as a cloud on title to the Roberts Property. As to the named defendants in this proceeding, title to the Roberts Property is quieted in the Trustee. However, the court questions its jurisdiction to quiet title in the Roberts Property in Trustee as to the current title holder Heidi Christensen, even though it is undisputed Debtor acquired any and all interest Ms. Christensen had in the Roberts Property no later than September 30, 2014.

Having granted this relief under the Trustee's complaint, the court need not address the alternative theories and remedies asserted in the complaint.

V.    **Summary of Conclusions of Law**

DLT-19 is not a legally created express trust under Montana law due to the failure to properly convey the Roberts Property to Ms. Barnes as trustee of DLT-19. As a result, no transfer of trust property to DLT-19 occurred, and the Roberts Property is not held in trust. Debtor was the sole equitable owner of the Roberts Property on the Petition Date. He had all indicia of ownership, save for legal title. He purchased Ms. Christensen's one-half interest in the Roberts Property prepetition, no later than September 30, 2014, becoming the full owner, attempted to convey the property to DLT-19, possessed the Roberts Property, built the home on the property, periodically lived on the Property, and he leased and attempted to sell the property. Without a valid trust, neither exclusion from property of the estate, § 541(b)(1) nor § 541(c)(2), is applicable under the facts of this case.

In the alternative, even if Exhibit S-BP and the Christensen warranty deed were legally sufficient to create a valid trust, the separate legal existence of DLT-19 should be disregarded under

---

[170] *See In re Endeavour Highrise, L.P.,* 432 B.R. 583 (Bankr. S.D. Tex. 2010) (identifying, quieting title to, and obtaining possession of property of the estate is a critical part of administering the estate).

[171] *In re Turville,* 363 B.R. 167 (Bankr. D. Mont. 2007).

[172] *See* MONT. CODE ANN. §§ 70-28-104 and 70-28-107. *See also Schumacher v. Cole,* 309 P.2d 311 (Mont. 1957) (following *Sanborn v. Lewis and Clark County,* 120 P.2d 567 (Mont. 1941)).

the alter ego doctrine and reverse piercing as a matter of equity to prevent injustice to Debtor's creditors. At all times since the trust's alleged inception on September 30, 2014, Debtor failed to follow the terms of the trust and provide or receive written direction to the trustee or from the beneficiary to deal with the trust property, failed to disclose the trust to the sole beneficiary, exercised control over and possession of the Roberts Property, and acted inconsistently with Exhibit S-BP, which he claims is the controlling trust instrument. The Roberts Property is therefore property of the estate under Section 541(a)(1) on this alternative basis. In any event, if DLT-19 were a valid trust, it was revocable by Debtor as settlor and on the Petition Date, such power of revocation is exercisable by the Trustee.

The Roberts Property is and remains property of the bankruptcy estate subject to administration by the Trustee. Title is quieted in the Roberts Property in the Trustee as to the named defendants to this adversary proceeding, as Debtor acquired the whole of the Property when he acquired Christensen's interest which was no later than September 30, 2014. The Christensen warranty deed to DLT-19 (Exhibit 12) is canceled and is removed as a cloud on title to the Roberts Property. As to non-party Heidi Christensen, the Trustee is entitled to turnover of legal title to the Roberts Property under Section 542(a).

With respect to the construction equipment claims, the court concludes the Trustee has failed to meet his burden of proving Debtor had a property interest in the construction equipment on the Petition Date. Nor has the Trustee established a basis for applying reverse piercing to reach the construction equipment assets owned by Debtor's entity MMLH.

The court addressed the evidence involving Ms. Wait during the trial rendering Debtor's Motion in Limine moot.

Judgment shall be entered in this proceeding consistent with this Opinion.

BY THE COURT

_12/28/2022_

Honorable Cathleen D. Parker
United States Bankruptcy Court
District of Wyoming